**UNITED STATES of America,**
Plaintiff,

v.

**LOEW'S, INCORPORATED, Defendant.**

**UNITED STATES of America,**
Plaintiff,

v.

**C & C SUPER CORP., Defendant.**

**UNITED STATES of America,**
Plaintiff,

v.

**SCREEN GEMS, INC., Defendant.**

**UNITED STATES of America,**
Plaintiff,

v.

**ASSOCIATED ARTISTS PRODUCTIONS, INC., Defendant.**

**UNITED STATES of America,**
Plaintiff,

v.

**NATIONAL TELEFILM ASSOCIATES, INC., Defendant.**

**UNITED STATES of America,**
Plaintiff,

v.

**UNITED ARTISTS CORPORATION,**
Defendant.

United States District Court
S. D. New York.
Dec. 2, 1960.

See, also, 20 F.R.D. 423, 23 F.R.D. 178.

Leonard R. Posner, Eugene J. Metzger, George A. Avery, Lewis A. Rivlin, Jack L. Lipson, Melvin Spaeth, Attys., Dept. of Justice, Washington, D. C., for plaintiff.

Phillips, Nizer, Benjamin, Krim & Ballon, Benjamin Melniker, New York City, Louis Nizer, Paul Martinson, Simon Rose, Gerald F. Phillips, Albert F. Smith, Donald J. Wollins, Bernard Segelin, New York City, of counsel, for defendant Loew's Inc.

Mervin C. Pollak, New York City, for defendant C & C Super Corp.

Schwartz & Frohlich, New York City, for defendant Screen Gems, Inc.; Myles J. Lane, Everett A. Frohlich, Joseph Taubman, Georgiana Koenig, New York City, of counsel.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant Associated Artists Productions, Inc. and United Artists Corp. Inc.; Louis Nizer, Paul Martinson, Simon Rose, Gerald F. Phillips, Albert F. Smith, Donald J. Wollins, New York City, of counsel.

Golenbock & Darell, New York City, for defendant National Telefilm Associates, Inc.; Justin M. Golenbock, Philip Mandel, New York City, of counsel.

DAWSON, District Judge.

### General Nature of the Actions

These are six civil anti-trust actions instituted by complaints filed by the United States in March of 1957. They allege violations of §§ 1 and 3 of the Sherman Act, 15 U.S.C.A. §§ 1, 3.

The complaints allege, with respect to each defendant, that beginning in the latter part of 1956 and continuously since that time, the particular defendant has entered into, and refused to deal other than on the basis of, block-booking contracts. They define "block-booking" as the sale or licensing of feature films to television stations for exhibition on television in a block whereby the licensing of one feature film is conditioned by the licensor upon the licensing by the licensee of one or more other feature films.

The complaints seek the Court to declare the following relief:

(1) That the defendants have unlawfully contracted in restraint of interstate trade and commerce in the distribution of feature films in violation of § 1 of the Sherman Act.

(2) That defendants be enjoined from refusing to license feature films to television stations on a picture-by-picture, station-by-station basis.

(3) That the Court direct the defendants to offer to renegotiate the existing contracts for block-booking entered into between them and television stations in the United States so as to give any said station an opportunity to license defendants' feature films on a picture-by-picture, station-by-station basis.

### The Parties and Jurisdiction

Defendant Loew's, Incorporated is a corporation organized under the laws of the State of Delaware and transacts business and is found within the Southern District of New York.

Defendant C & C Super Corp. is a corporation organized under the laws of the State of Delaware and transacts business and is found within the Southern District of New York.

Defendant Screen Gems, Inc. is a corporation organized and existing under the laws of the State of California and transacts business and is found within the Southern District of New York. Screen Gems is a wholly-owned subsidiary of Columbia Pictures Corporation.

Defendant Associated Artists Productions, Inc. is a corporation organized under the laws of the State of New York and transacts business and is found within the Southern District of New York.

Defendant National Telefilm Associates, Inc. is a corporation organized under the laws of the State of New York and transacts business and is found within the Southern District of New York.

Defendant United Artists Corporation is a corporation organized under the laws of the State of Delaware and transacts business and is found within the Southern District of New York.

Each defendant is engaged in interstate commerce and was, during the time covered by the complaint, engaged in the licensing of motion picture films for exhibition by television stations.

There is no issue as to jurisdiction or venue in the case.

### The Commerce Involved

Feature films are copyrighted motion pictures originally produced for exhibition in motion picture theatres. During the time covered by the complaints, feature films of various different producers were licensed for exhibition by television stations throughout the United States and were telecast by those television stations. This required the preparation of positive prints of the feature films and the shipment of those positive prints across state lines to television stations in various states of the United States. It required the telecasting of such films which, in many cases, were telecast across state lines. The exhibition of such feature films on television stations involved interstate commerce of a not insubstantial amount. There were released for exhibition on television by the defendants, in the aggregate, not less than 9,000 films and, during the period covered by the complaints, the defendants, in the aggregate, received compensation for the use of such films in an amount of not less than $110,000,000.

### Pre-Trial Procedures

After the cases were at issue, pre-trial procedures, both formal and informal, were conducted. The issues were explored and a pre-trial order entered defining the issues of fact to be tried. Since the Court found that all the actions involved similar and common questions of law and fact, a motion of the plaintiff for an order consolidating the six actions for trial was granted. This consolidation order provided, however, that each action should be disposed of individually, with separate opinion and separate findings of fact and conclusions of law in each action.

An application was made by certain of the defendants for an order for a separate trial of the relief demanded in the action. A hearing was held and the Court found that it would be unable to dispose of the issue of the relief demanded in the absence of proof as to the facts and therefore denied the application.

Other pre-trial hearings were held further to define and limit the issues to be tried and to identify the exhibits to be introduced at the trial and to pass upon objections with respect thereto.

### The Trial

The trial, which commenced on March 7, 1960, lasted for 36 court days and resulted in a transcript of 6,619 pages. During the progress of the trial the Court kept a running summary of the evidence, segregated as to defendants and particular issues involved. Eight hundred twenty-one (821) exhibits were admitted into evidence. The Government called 45 witnesses. The defendants called 28 witnesses.

The Court reserved decision on all motions at the conclusion of the evidence and directed that the parties exchange main trial briefs and proposed findings of fact and conclusions of law. All of the briefs have been filed and the Court has given consideration thereto.

### The Issues

The issues involved in the actions are essentially the same. They are two-

fold—(1) an issue as to whether it is a violation of the Sherman Act for a distributor of motion picture films to license such films to television stations for broadcast in groups or blocks—this is essentially an issue of law, and (2) if it is a violation of the Sherman Act to offer and license feature films in groups or blocks, whether the defendants and each of them did offer and license the films in groups or blocks in such a way as to condition the sale or license of one film upon the purchase or license of other films. This is essentially an issue of fact.

### The Law

The Sherman Act prohibits, in general language, contracts in restraint of trade. Necessarily, over the years, the Supreme Court has had to delineate the types of contracts which in its opinion restrain trade. One category of such contracts is the tying contract, i. e., the conditioning of the sale of one product on the sale of another or other products. Early in the history of the anti-trust laws this practice was condemned.

Early cases involved classic examples of tie-in sales where the license of a patented product was conditioned upon the purchase or use of certain non-patented products. Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 491, 62 S.Ct. 402, 86 L.Ed. 363; Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436, 459, 60 S.Ct. 618, 84 L.Ed. 852; International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20.

The principle laid down in those cases was applied to the licensing of motion picture films in United States v. Paramount Pictures, 1948, 334 U.S. 131, 156, 68 S.Ct. 915, 929, 92 L.Ed. 1260. The Court said:

> "Block-booking is the practice of licensing, or offering for license, one feature or group of features on condition that the exhibitor will also license another feature or group of features released by the distributors during a given period. The films are licensed in blocks before they are

actually produced. All the defendants, except United Artists, have engaged in the practice. Block-booking prevents competitors from bidding for single features on their individual merits. The District Court [66 F.Supp. 349] held it illegal for that reason and for the reason that it 'adds to the monopoly of a single copyrighted picture that of another copyrighted picture which must be taken and exhibited in order to secure the first.' That enlargement of the monopoly of the copyright was condemned below in reliance on the principle which forbids the owner of a patent to condition its use on the purchase or use of patented or unpatented materials. See Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 459 [60 S.Ct. 618, 84 L.Ed. 852]; Morton Salt Co. v. [G. S.] Suppiger Co., 314 U.S. 488, 491 [62 S.Ct. 402, 404, 86 L.Ed. 363]; Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 665 [64 S.Ct. 268, 271, 88 L.Ed. 376]. The court enjoined defendants from performing or entering into any license in which the right to exhibit one feature is conditioned upon the licensee's taking one or more other features.

> "We approve that restriction * * * Where a high quality film greatly desired is licensed only if an inferior one is taken, the latter borrows quality from the former and strengthens its monopoly by drawing on the other. The practice tends to equalize rather than differentiate the reward for the individual copyrights. Even where all the films included in the package are of equal quality, the requirement that all be taken if one is desired increases the market for some. Each stands not on its own footing but in whole or in part on the appeal which another film may have. As the District Court said, the result is to add to the monopoly of the copyright in

violation of the principle of the patent cases involving tying clauses.

\* \* \* \* \* \*

"We do not suggest that films may not be sold in blocks or groups, when there is no requirement, express or implied, for the purchase of more than one film. All we hold to be illegal is a refusal to license one or more copyrights unless another copyright is accepted."

The Paramount decision has been referred to with approval on several subsequent occasions by the Supreme Court. See Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 608, 73 S.Ct. 872, 97 L.Ed. 1277; Northern Pacific R. Co. v. United States, 1958, 356 U.S. 1, 9, 78 S.Ct. 514, 2 L.Ed.2d 545.

See also, "The Validity of Tying Arrangements Under the Antitrust Laws," by Donald F. Turner, 72 Harv.L.Rev. 50, 53 (1958).

It has been urged that the only antitrust action which specifically declared block-booking to be illegal was the Paramount case and that this decision was rendered in the setting of the particular case, involving as it did the broad area of monopoly and unfair practices. The decision itself was not limited to the situation growing out of monopoly or unfair practices. The recent opinion of the Court of Appeals for the Fifth Circuit on the petition for rehearing in Pape Television Company, Inc. v. Associated Artists Production Corp., 5 Cir., 1960, 279 F.2d 217, 218 seems adequately to dispose of this argument. That court said:

"We recognize that the statement of an abstract legal principle, even when made by the Supreme Court, is a binding precedent only insofar as it is applied to the facts of the case in which the pronouncement is made. We further recognize that there is no case in which the only 'anti-trust' practice charged is the practice of block-booking. There may, therefore, be some merit in the argument that until such a case is before the court for decision any

general condemnation of block-booking, except in the circumstances in which it is practiced in the particular case is dictum.

"In our search for decisions of the Supreme Court, either to control our action or to guide it, we are not infrequently guided by a statement of general principles even though the statement is broader than is necessary to decide the case before the Court. It is difficult to see how the statement of the Supreme Court in the block-booking case and the 'tie-in' cases, Northern Pacific R. R. Co. v. United States, 356 U.S. 1, 78 S. Ct. 514, 2 L.Ed.2d 545; Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 595, 73 S.Ct. 872, 97 L.Ed. 1277; Black v. Magnolia Liquor Co., 355 U.S. 24, 78 S. Ct. 106, 2 L.Ed.2d 5, could be construed in any manner other than as a condemnation of every practice in which a party owning a legal monopoly over an article conditions the sale or licensing of that article upon the agreement of the other party to buy or bargain as to another product. \* \* \*."

The Trial Court, in its pre-trial order in this action, therefore defined the issues of fact to be tried as follows:

"Whether defendant has (a) licensed, (b) offered to license one or more of its feature films to television stations on a condition that the licensee also license one or more other such feature films;" and

"Whether defendant has refused, expressly or impliedly, to license any of its feature films to television stations unless one or more other such feature films were accepted by the licensee."

 The Court concludes that if the answer to these issues is in the affirmative, a defendant has violated § 1 of the Sherman Act under the decisions of the Supreme Court which have been adverted to. Whether the decisions of the Supreme Court on the issue are correct

or not is a matter which should be argued in the Supreme Court. A district court is bound by the decisions of the Supreme Court and the effect of such previous decisions does not seem open to doubt.

The issue of fact therefore is: Were feature films licensed by the defendants to television stations *on condition* that they also license one or more other films?

It would be appropriate at this point to indicate what activities would be accepted as evidence of such conditioning and what might not.

■ In the first place, it is clear that the defendants had a legal right to *offer* their films in blocks or groups.[1] An *offer* to license in blocks or groups is not illegal, but a conditioning of the license of one or more films upon whether or not other feature films were also licensed is illegal. Therefore, the great mass of evidence introduced to show that the defendants offered their films in blocks or groups, while relevant as background material, is not in and of itself proof of conditioning or block-booking. The Government had to establish, in addition, that defendants refused to license films except in blocks or groups. The Court, in its findings of fact, finds block-booking to exist only in those cases where the facts show such *refusal* to license one or more films and show that such refusal constituted a condition, in that it was imposed in order to compel the respective licensees to purchase other and additional films.

Since this action involves *contracts* which are alleged to be in violation of the Sherman Act, we are not here concerned, except as corroborative and background information, with abortive negotiations which broke down before licenses or contracts were arrived at. It is the contract, and not incomplete negotiations which, under the issues posed by the pleadings, must be examined in or-der to reach a determination as to the legality or illegality of the transactions. This does not mean that the contract itself must contain a block-booking clause. If the evidence shows that the television stations sought to make a selective purchase and that defendant refused such selectivity and insisted upon the group or package being purchased as a whole, then, if the contract entered into was the result of such negotiations, we have a block-booked contract, even though no clause to that effect is found in the written agreement.

An important question is this: What evidence is sufficient to show refusal to license except upon a block-booked basis?

The defendants urge that the evidence upon which the Government relies is evidence of *salesmanship* on the part of their employees, rather than a refusal to break the packages of films offered. This is, of course, an issue of fact. The Court recognizes that the employees of the defendants had a right to try to license as many films as possible, so as to increase the revenue of their employers. They had a right to license films in blocks or packages and to use arguments to persuade the licensees that it was desirable to purchase the films in blocks or packages rather than individually. Illegality would enter only when representatives of the defendants refused to do business in any way other than by licensing the feature films as part of a package.

The defendants also urge that there can be no conclusion of a refusal to sell on a selective basis unless a television station made a "clear demand" for a smaller number of pictures. This again presents an issue of fact. Of course, if a demand is made for a smaller number of features and the defendant refused even to negotiate on this basis, the refusal is established.

■ But, is a *demand* a prerequisite to a finding of refusal? There may be

1. "We do not suggest that films may not be sold in blocks or groups, when there is no requirement, express or implied, for the purchase of more than one film. All we hold to be illegal is a refusal to license one or more copyrights unless another copyright is accepted." United States v. Paramount Pictures, 1948, 334 U.S. 131, 159, 68 S.Ct. 915, 930, 92 L. Ed. 1260.

an inference that it is in certain opinions in treble-damage actions. J. J. Theatres, Inc. v. Twentieth Century-Fox Film Corp., 2 Cir., 1954, 212 F.2d 840, 845; Royster Drive-In Theatres, Inc. v. American Broadcasting-Paramount Theatres, Inc., 2 Cir., 1959, 268 F.2d 246, 251, certiorari denied 1959, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121; Milwaukee Towne Corp. v. Loew's Inc., 7 Cir., 1951, 190 F.2d 561, 568, certiorari denied 1952, 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680. This may well be a rule of law applicable as to the allowance of damages in a private anti-trust action, but it can hardly be laid down as a rule of law in an action in which the Government is seeking an injunction. Furthermore, as Judge Washington said in the Royster case, "Perhaps on occasion circumstances may excuse the lack of demand." 268 F.2d at page 251. The Court does not believe that a specific "demand" is a necessary prerequisite of a finding of refusal if there is sufficient other evidence to justify a finding that there was a refusal on the part of the distributor to deal except on a block-booked basis.

■ The defendants urge that "there is no market dominance by any defendant and hence there can be no illegal tie-in." There can be no dispute that the evidence showed that no defendant had market dominance over the feature film market as such. Each defendant owned its own feature films. There were numerous feature films on the market and there was intense competition among the defendants to market their own films. However, each film was in itself a unique product. Each film was copyrighted. Each film was unique in its subject matter and presentation. Each defendant had market dominance as to its own feature films. Nor were feature films fungible. They were all films, it is true, but they varied in theme, in artistic performance, in stars, in audience appeal, etc. Certainly each defendant was in a monopolistic position as to the tying product—which was its own feature films— for it had complete monopoly or control of those particular films. True, it did

not control all the feature films in the country, but neither did Northern Pacific Railway Company control all the real estate in the entire country. See Northern Pacific R. Co. v. United States, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545.

■ Defendants also urge that "Without separate markets for the 'tied' and 'tying' products, there can be no illegal tie-in."

They urge in support of this argument that grades of the same product, i. e., feature films, are not the subject of an illegal tie-in. This is certainly contrary to the decision in the Paramount case and it is certainly contrary to the philosophy of the tie-in cases. In order to be a "tie-in" there must, of course, be two distinct products, but grades of feature films might constitute different products. To say that a television station may not license "Gone With The Wind" unless, at the same time it licenses "Getting Gertie's Garter" is just as much a tie-in of disparate products as to say a buyer may not purchase a certain salt machine unless he also buys a particular brand of salt.

The Nature of the Television Industry and the Use Therein of Feature Films

In order to understand the evidence in the case, it is necessary to understand the nature of the television industry and the use of feature films in connection therewith.

The evidence is undisputed that a number of motion picture companies, by the early part of 1956, had accumulated a large number of old films which had been displayed in motion picture theatres but had run their course in those theatres. The motion picture companies concluded that these old films, known in the trade as "pre-1948 films" might have a market in the television industry. These films were known as "feature films," which are defined in the complaint as meaning "copyrighted motion pictures of four reels or more in length, including Westerns but excluding motion pictures of strictly educational, religious or industrial character." The evidence indicated

that there were numerous motion picture companies which had libraries of old feature films available for television early in 1956, when they decided to market them to the television stations. The number of feature films available at that time was approximately 2,500.[2] All were copyrighted. The business of licensing feature films to television was, in 1956, a relatively new and unique business. What was being marketed was a residual by-product in the sense that these were old motion pictures, made for theatrical exhibition years earlier, resurrected for display in a new medium.

Unlike the use of feature films in motion picture theatres, the viewers did not pay for the film. The television stations secured their revenue from advertisers. In order to secure this advertising revenue it became necessary that the stations have viewers and for the purpose of securing viewers the television stations provided what they called, with more or less justification, entertainment. This might be live entertainment or it might be provided by the use of motion picture films. The advertiser was charged by the station for the time devoted to the presentation of his advertisement. If the advertisement was shown in conjunction with a feature film, the advertiser had no choice as to the film shown. He was concerned with the average audience exposure to his advertisement, which depended in part on the station's rating, and this rating would be determined by the over-all appeal of the entire program, not by the appeal of any particular feature film shown.

There was no single television market to which sales could be made. There are about 522 television stations in the United States, divided into approximately 240 markets. A television market consists of the geographical area reached by the signals of a particular station. One market, such as New York, might have many stations, but in various parts of the country there is only one station to a market.

Thus in marketing feature films to television stations there could never be a standard price for films throughout the country. The price would vary from market to market, depending in large part on the size of the particular market.

It also became necessary, as a result of this market condition, for a motion picture company to enter into licensing activities with respect to each market. If there was more than one station in a market, the purchasing or licensing by one station of certain feature films would effectively block the sale of those films to any other stations in the same market, because the stations in each market expected exclusivity, at least for a certain period of time, when they secured the right to show a feature film on their station.

Motion picture films were in direct competition with all other types of television entertainment, including live shows, taped shows and films made especially for television presentation. Just as those programs varied in audience appeal so also there was a difference in the audience appeal of different feature films, each one of which was, in a certain sense, a unique product.

### General Findings of Fact as to All Defendants

In each case the alleged conditioning was an issue of fact. The Court has therefore been careful not to hold any contract to be "block booked" where the evidence failed to meet the test set forth in the pre-trial order. The Government presented evidence seeking to establish that in the aggregate and among all the defendants there were 68 block booked licensing agreements entered into. The Court has analyzed the evidence in each of these transactions with the conflicting versions of evidence given by the defendants' witnesses. It has indicated hereinafter and in the findings of fact which of the transactions may be deemed

---

2. At the present time there are approximately 9,000 to 10,000 feature films available for licensing to television stations.

to establish the type of conditioning which meets the test set forth in the pretrial order. There were many other licenses entered into which did not involve block booking.

In view of the provisions of § 5 of the Clayton Act, Title 15 U.S.C.A. § 16, making a final judgment in this action prima facie evidence against defendants in any action or proceeding brought by any other party against said defendants under the antitrust laws with respect to all matters where such judgment or decree "would be an estoppel as between the parties thereto," the Court has been careful in analyzing the evidence to find as instances of block booked contracts only those contracts where a fair preponderance of the evidence would support the position that such contract was in fact a block booked contract.

This caution on the part of the Court has been necessary because it became obvious during the trial that certain of the witnesses from the television stations were interested in establishing the basis for future suits and their testimony may have been colored by this desire.[3] In fact the Court would be less than frank if it did not state that senior trial counsel for the Government gave the impression, from time to time, that he was not so much interested in establishing the principles for which the suit ostensibly was brought, as in laying a foundation, at the Government's expense, for future treble damage actions to be brought by television stations against the defendants.

█ However, the evidence is sufficient to indicate that defendants and each of them, in the period covered by the action, have at times licensed or offered to license one or more feature films to television stations on condition that the stations also license one or more other feature films; and that certain license agreements conditioned by such conduct

have been entered into by the defendants and each of them.

The evidence presented to the Court showed that there was keen competition between the various motion picture companies for the licensing of their feature films to the television stations throughout the country. There was no issue of monopoly, combination or conspiracy in the case.

### Findings of Fact Relating Specifically to the Defendant Loew's, Inc.

The evidence showed that the policy of defendant Loew's, Inc., a Delaware corporation, in connection with the distribution of its feature films to television stations, may be divided into two periods of time: the first, that from June 1956 to April 1957; and the second, that following April 1957.

On or about June 20, 1956, Loew's decided to release its pre-1948 feature films for general distribution to television stations, after discarding alternative plans to sell its library of films outright on a capital gains basis or to work out a lease-guarantee arrangement with an independent syndicate. They determined to make the sales through their own sales organization which had to be set up for that purpose. At that time Loew's had 723 pre-1948 feature films which in bulk they designated as their "library." However, they did not have, at that time, the necessary prints for the showing of these films on television. The television stations required 16 mm. films, whereas the motion picture theatres had required 35 mm. films. Nor did Loew's at that time have any sales organization to handle the sales of the films to television stations. It therefore began to organize a sales force and to train this force. It also set up procedures for preparing the pre-1948 feature films for release to television, including the reduction of the films to 16 mm. and the change of color film to black and white film. It

3. See, for example, the testimony of E. K. Jett, vice president of WMAR–TV of Baltimore, Md. "We are not asking for renegotiation. But, if, as a result of this trial, renegotiation should be permitted, then we want to get on the gravy train."

was found that of the total number of feature films then available only 70 had been reduced to the 16 mm. size, and of the 70 only 20 were found, upon inspection, to be usable, because of decomposition of the balance. By December 31, 1956 Loew's had assembled out of its entire library of 723 films only 150 16 mm. features for release to its licensees.

When Loew's decided in June, 1956, to release its pre-1948 feature films for distribution to television, it followed this up with a publicity announcement to the trade which resulted in numerous inquiries from stations in all parts of the country as to the possibility of leasing the entire library, coupled with specific requests to obtain the Loew's features on an exclusive basis.

Loew's had the right to sell or license its films in those locations which would produce for it the maximum revenue. This it could do best by entering into an arrangement with television stations for the sale or license of its entire library as one transaction in each market. It decided that it would first try to sell the one hundred best markets, which would have the greatest need for its entire library at the substantial price it determined to ask. By March 1957 some 20 full library deals had been consummated, none of which involved requests from television stations for fewer films than the entire library.

It was the contention of Loew's that it was not in a position during this early period to offer its films on an individual basis because it did not have the prints available and because it had not yet established a basis for a price schedule for individual pictures for the numerous television stations which existed in various markets throughout the country.

Mr. Barry, who was in charge of organizing the distribution of Loew's feature films to television stations, testified that Loew's contemplated individual sales of films to the television stations which did not wish to purchase the entire library, but in the beginning he could not determine what he had to sell and how soon prints would be available. He pointed out that in a full library sale, which might take seven years to play off in a television market, the station would not need the prints immediately but that a buyer who sought to purchase selected films would need the product immediately, which Loew's could not furnish because of the delay caused by the conversion of the prints.

That it was Loew's initial policy to license its features on a full library basis only was not disputed by this defendant, it being conceded by counsel for Loew's that such a policy was in effect during the period from August of 1956 to about March of 1957.

Negotiations for the sale of half library and smaller groups of films commenced as early as November or December of 1956, but no such contracts were consummated at that time.

Evidence was introduced of nine separate negotiations conducted by Loew's during this period from August 1956 to and including April of 1957. In each instance the entire Loew's library, consisting of 723 titles, was initially offered in its entirety. The evidence was clear and undisputed, and not contradicted by defendant, that Loew's during this period was interested only in the sale of its entire library. Out of the nine negotiations, concerning which testimony was given, in only two did the television stations make specific counter proposals to license a limited number of titles. These were stations WMAR and WTOP situated in Baltimore, Maryland and Washington, D. C., respectively. With respect to one of these stations (WMAR) Loew's subsequently offered its library in three groups of 100 titles each with the station permitted to select a cross-section of films from each of the three groups. In other negotiations Loew's refused to negotiate on other than the full library basis. These negotiations were with stations KMGM, WCDA, WHIZ, WXEX and WTAR.

On April 5, 1957 Loew's determined that it would offer to sell or license the feature films in its library on an individual basis, if the television stations de-

sired to negotiate on that basis. This determination may have been stimulated by the filing of this action on March 27, 1957. An announcement of this new sales policy was issued on April 5, 1957 to all sales personnel and an advertising campaign was instituted in various trade journals to the same effect. The following full page advertisement appeared in a May 1957 edition of "Variety," a nationally recognized trade journal of the entertainment business:

"Pick a number from 1 to 723. No matter how many feature films your station programs, MGM–TV has a plan to fill your needs, a plan that will bring you higher audience ratings and bigger sales increases than you ever imagined. For 'one time' impact, choose single pictures individually priced in keeping with their fabulous audience appeal. Or, for maximum economy, choose one of the already-packaged groups consisting from 100 to 700 titles of the greatest motion pictures ever produced."

Mr. Barry, who was in charge of television sales for Loew's, testified that since this date in April 1957 it has been the unqualified policy of Loew's to negotiate and license its features on an individual basis, or on a group basis, as the customer wished. He stated that prices for individual titles were furnished potential customers and the per title price was always open to negotiation, with such factors as the size and value of a particular market and the strength of the competition being taken into account. He testified that at no time subsequent to April 5, 1957 was the sale of any feature film conditioned on the taking of other features.[4]

Testimony was given as to eleven separate negotiations conducted by Loew's subsequent to April 5, 1957, ten of which resulted in the execution of licenses. In these licenses a clause substantially as follows appeared:

"Licensee hereby acknowledges that distributor has furnished licensee a list and description of all pictures distributor has made available for broadcast in the licensed territory and that distributor has granted licensee an opportunity to license any and/or all of said pictures. Licensee further acknowledges that it has selected from said list the pictures listed on Schedule A attached hereto, that said pictures were licensed as a group solely for the convenience of licensee, and that distributor has not conditioned the license of any picture listed on Schedule A upon the licensing of any other picture listed on Schedule A. Licensee further acknowledges that it has selected from the foregoing list the pictures listed on Schedules B, C, D and E attached hereto, and that the option relating to said pictures as a group is solely for the convenience of licensee, and that distributor has not conditioned the licensing of any pictures listed on such schedule upon the licensing of any other picture listed on such schedule."

In each of these eleven instances Loew's offered its entire library, or half of a library, or pre-selected groups of 100 features each.

In only two of the eleven negotiations does it appear that Loew's conditioned the licensing of certain films on the licensing of additional films. These two

4. An analysis of all Loew's licenses entered into from the initial distribution of its features to date indicates that out of a total of 203 contracts, 137 (all of which were negotiated subsequent to April of 1957) were for less than the full library. Of that number, 89 contracts consisted of "special selections," i. e., licenses which deviated in number of films purchased from the normal pack- ages offered by Loew's during this period. Although these latter contracts, standing alone, do not serve as proof that each negotiation resulted in a selective purchase, they provide some indication that Loew's was attempting to effectuate its policy of providing its licensees with an opportunity to negotiate on a picture by picture basis.

negotiations involved stations KWTV located in Oklahoma City, Oklahoma and WBRE, located in Wilkes-Barre, Pennsylvania. In these negotiations Loew's apparently failed to furnish the stations with individual prices. At the same time Loew's refused these stations' requests for selectivity among the films in the groups.

(1) Station KWTV, of Oklahoma City, Oklahoma, which entered into a license on March 12, 1958, indicated to Messrs. Harper and Gresham that it wished to purchase only 500 titles out of the entire Loew's library. The testimony was that both representatives of defendant stated that there could be no selection of individual films made from the library.

(2) Station WBRE, of Wilkes-Barre, Pennsylvania, concluded a license with the defendant dated August 28, 1958. The general manager of this station testified that he requested the right to select a group of 100 features out of each of the three packages of 100 films being offered, and was told by both Messrs. Mowrey and Morin of Loew's that this was not possible.

It is significant that in both of the above negotiations the defendant failed to provide individual prices for each picture in the library or packages of features which it offered to license, in view of the claim that since April of 1957 such price lists were furnished potential station licensees as an integral part of defendant's avowed policy of promoting selective purchases. In the absence of proof that such individual prices were furnished, and in light of the unsuccessful station attempts to obtain selectivity, the inference remains that the package had to be taken as such or not at all, a sufficient showing of conditioning to conclude that the contracts were block booked contracts.

In three of the contracts about which testimony was received, the Government contends that illegal tie-ins resulted through Loew's use of pricing differentials.

To establish an illegal tie-in through pricing differentials it would seem that three things must be shown. First, in order to license a relatively small number of selected films the station must pay a price substantially as high as the price charged for a much larger package which includes the desired films. Second, the price differential cannot be satisfactorily explained by quality or desirability differences. Third, because of *this differential* the station selected the larger package.

The Government's proof does not meet this burden. In two negotiations the Government has contended that at certain times comparisons between Loew's initial package *offer* and the selective *offer* evidence a significant price differential. Yet by the time of execution of the contracts the terms of these agreements bear little resemblance to the original offers either in price or quantity of films. The differentials formerly present have vanished.

A third situation where the Government relies on this theory does not even reveal a significant price differential in the original offer of Loew's.

Of the remaining six negotiations on which testimony was given, five resulted in the formation of contracts. Of these one is not before the Court due to the Government's failure to answer interrogatories. Another is not cited by the Government as block booked.

The remaining three contracts manifest no unlawful conditioning. The negotiations leading to these contracts must be reviewed in light of the then advertised policy of Loew's to sell from 1 to 723 films. One station made no request at all for selectivity although it had been advised of its right to select any number of pictures that it desired. The other two informed Loew's of their hesitance to sign contracts indicating that the right of selectivity existed in their negotiations. Loew's responded by letter, stating that it was willing then as before to license its films individually or in combinations. Neither station acted upon this proposal. With respect to these two

stations, therefore, while there were station inquiries as to selective purchases, the stations did not accept Loew's subsequent offers of selectivity and it cannot be said that the contracts were block booked.

### Findings of Fact Relating Specifically to the Defendant C & C Super Corp.

C & C Super Corp. (hereinafter called " C & C") is a Delaware corporation with its principal place of business in New York. Its name has now been changed to Television Industries, Inc.

During the latter part of 1955, C & C negotiated with RKO-Radio Pictures, Inc. for the grant of telecasting rights in some 742 RKO feature motion picture films, which were known as the "RKO Library". These negotiations led to the execution of an agreement on December 22, 1955 whereby C & C obtained the right to license these films to television stations for telecasting, subject to certain reservations. The price to be paid by C & C for the rights under the contract was $15,200,000. To secure the necessary financing C & C negotiated a loan with First National Bank of Boston for an amount equal to 100% of the sum payable to RKO. In order to get the bank loan, C & C secured a guarantee from International Latex Corporation that would enable C & C to repay the obligation to the First National Bank of Boston. In exchange for large quantities of television spots to be turned over by C & C for advertising of the Latex products, International Latex agreed to pay specified sums to C & C. Under the Latex agreement television rights in the RKO films could not be sold or transferred, except subject to the rights of Latex. C & C was obligated to use its best efforts to trade television rights for advertising spot time assignable to Latex in barter contracts with television stations in the first one hundred markets in the United States. Before any such barter contract would entitle C & C to compensation from Latex, the television contract had to meet certain minimum specifications with respect to the spots

made available for Latex use. Originally this had to be ten 60 second spots, seven days a week, for a minimum of thirty-six consecutive months. After a period of unsuccessful negotiation, it was agreed that the demands made necessary by the first Latex agreement were unreasonable and impractical. These were, therefore, altered by an amendment to the agreement on August 1, 1956. This amendment reduced the minimum number of daily spots required to entitle C & C to compensation from Latex to six instead of ten.

In order to comply with its contractual obligations, C & C began to market the RKO films to television stations, securing in exchange therefor television advertising spots to be made available to Latex. The RKO library was broken down by C & C into packages of varying sizes whch could be selected by the station. The station, in any event, had to furnish the minimum number of spots for advertising Latex products. No procedure was developed for marketing an individual picture or small numbers of pictures, and under the barter arrangement provided in the C & C contract it was not possible for C & C to negotiate except for packages or groups which would produce the minimum number of advertising spots to be provided for Latex. Of course, a television station did not have to take all the pictures in a group, but it had to provide the minimum number of spots fixed as compensation for a package, whether it took one or all of the pictures. The net effect of this arrangement was that there was no opportunity for bargaining for individual pictures or for small numbers of pictures. The package proposals were presented to the C & C salesmen with instructions to the general effect that these were the only deals C & C had to offer to the stations. Although C & C sometimes permitted a station limited selection of pictures, this was always subject to the requirement that the minimum number of advertising spots be provided, which had the effect of forcing the sale of pictures in groups or packages.

On these fundamental facts there seems to be no substantial dispute between the parties.

When the films were first offered to television stations by C & C, the initial sales proposal was to license the entire library of 742 features to a station in perpetuity in exchange for ten 60 second television spots per day, seven days a week for five years, plus a number of radio spots and a cash license fee, or half the library in exchange for ten 60 second television spots per day for three years, plus 60% of the radio spots and license fee fixed for the entire library. After the amendment of August 1, 1956 it was provided that the library could be broken down in the following manner: In addition to varying cash charges the films-to-spot plan was as follows:

(1) 742 features in exchange for ten television spots per day over a five year period in the first one hundred markets;

(2) 371 features in exchange for ten television spots per day for three years in the first one hundred markets; this was later changed to six spots per day for five years;

(3) 222 features in exchange for six spots a day for three years in the first one hundred markets;

(4) 445 features in exchange for ten spots a day over a three year period in the first one hundred markets;

(5) 400 features in exchange for ten spots a day for five years in markets ranked 101 through 240;

(6) 240 features in exchange for ten spots a day for five years in markets ranked 101 through 240;

(7) 126 features in exchange for six spots a day for three years.

The general manager of C & C testified that when the library was first offered to television stations the C & C sales force was instructed not to invite offers for any individual features. He also testified that C & C had no objection to and never refused a station's request for selectivity, so long as the station provided the minimum number of spots called for. There is, however, a substantial body of testimony denying this right of selection. In any event, all parties agree that the minimum number of spots always had to be provided for the Latex advertising.

Thus C & C found itself in a corner. In order to complete the RKO purchase, it had obtained the Latex guarantee. In order to obtain the Latex guarantee, C & C had executed the Latex agreement. Under the Latex agreement C & C could license films only if it could deliver a large quantity of advertising spots. Unless it could deliver stipulated minimum numbers of spots, it could not license any films.

This then was the situation: C & C had a schedule of minimum charges. These charges related to specified maximum numbers of films, e. g., ten spots a day for five years, 742 features; six spots for three years, 222 features. Packages were then prepared to complete the offer, i. e., in return for ten spots a day for three years the station could choose to take the 371 films comprising either "Royal A" or "Royal B." Films were generally preselected by C & C. They would refuse to consummate any sale for less than a stipulated minimum return. C & C never said "you must take all 371 or 222 of these films." They merely said "you must pay for all 371 or 222 films."

The Latex agreement forced C & C to set minimum fees. This, in effect, forced C & C to sell only in groups or packages. C & C was not equipped to deal in terms of individual or small numbers of films. The Latex agreement, by requiring a minimum number of spots, forced C & C to adopt a company policy of block booking. By conditioning every sale on a minimum price, the stations, if they wanted any features, had to take, or at least pay for, a fixed group of pictures.

Evidence was entered indicating that from January 1956 to the date of the trial C & C entered into fourteen separate negotiations with television stations throughout the country, nine of which resulted in contracts for either the full

library or for packages of features designated by C & C.[5] Many aspects of the negotiations exemplify C & C's block booking policy.

In two instances stations told C & C that they would prefer to lease fewer films in return for fewer spots; and, on both occasions, were informed that this would not be possible due the rigidity imposed on C & C under the Latex agreement. (KMGM of Minneapolis, Minnesota and WXEX of Petersburg, Virginia). When KMBC of Kansas City, Missouri, reviewed the 445 films being offered, it considered fifty undesirable. But upon being told that if it did not take the fifty there would be no abatement in the number of spots due C & C, KMBC took all 445. KMGM had a similar experience under its contract even though certain of the films were unplayable since they had a foreign language sound track.

WXEX's purchase of 444 features was comprised of a base block of 371 which it could choose from one of two balanced halves of the library and an additional smaller group of films. This latter group was to be chosen from among five balanced sets of 70 films each. WXEX was granted the "complete right of substitution" from these groups. But it could only substitute an "A" film for an "A" film and a "B" film for a "B" film, etc. Thus, even where substitution was permitted, the station could only acquire "A" films on condition that it accept fixed amounts of "C" and "D" films.

In all cases the films constituting the packages were selected by C & C with a view to balancing the alternatives and spreading the less desirable features. The following stations testified that in their opinion the packages purchased

contained certain films which could not be televised: KMBC, KMGM, WFIL of Philadelphia, Pennsylvania, WHTN of Huntington, West Virginia, WJBK of Detroit, Michigan and WJZ of Baltimore, Maryland. Some of the stations attempted to eliminate the unplayable and less desirable films, but upon finding C & C unwilling to make any adjustment dropped this course of negotiations. (KMBC, KMGM, WXEX). Others, believing that C & C would not agree to any elimination or substitution did not raise the question during their negotiations. (KTVW, WHTN, WFIL).

The record is replete with illustrations indicating a policy of block booking. There can be no question that C & C adopted and operated under an unlawful block booking policy.

However, having established that C & C was committed to a policy of block booking, further analysis to determine exactly which contracts were block booked is beyond the scope of the case at bar.

### Findings of Fact Relating Specifically to the Defendant, Screen Gems, Inc.

Screen Gems, Inc., a California corporation, is a wholly-owned subsidiary of Columbia Pictures Corporation. A principal facet of its business since January 1956 has been the distribution of feature films to television stations. From January 1956 to May 1957 Screen Gems entered into contracts licensing feature films to television stations which provided for payments to Screen Gems of revenues in excess of $7,000,000.

This defendant adopted a policy of offering films to television stations in small packages. One group, designated

---

5. 1. KMBC, contract of 4-6-57 for 445 features.
 2. KMGM, contract of 5-1-57 for 222 features.
 3. KTVW, contract of 11-12-56 for 742 features.
 4. WHTN, contract of 2-12-57 for 222 features.
 5. WFIL (Triangle Publications Inc.), contract of 4-16-56 for 742 features.

 6. WJBK, contract of 8-1-56 for 222 features.
 7. WJBK, contract of 9-1-57 for 284 features.
 8. WJZ (formerly WAAM), contract of 6-8-57 for 742 features.
 9. WXEX, contract of 5-1-57 for 444 features.

the "Hollywood Movie Parade" contained 104 titles, broken down into packages of 26 titles each. Another was designated the "Hollywood Premiere Parade" and had 39 titles. The price list furnished to salemen for Screen Gems did not contain individual prices for the feature films included in these packages, but rather an average price per title for each market. Salesmen were instructed that if a station desired to license less than the groups being offered they were to clear such offers with the home office.

The packages were "balanced" packages in the sense that they contained what might be called good, medium and poor quality pictures. Officials of the defendant testified that the four groups of 26 features each offered as the "Hollywood Movie Parade" were merely suggested titles and that if a station wished to purchase a selection from these groups any firm offer for such selectivity would be considered. If only one picture was desired the station would be asked to designate the title and offer a price for that picture. However, the rate card itself did not provide any price for a single feature offer.

Charles McNamee, a former Screen Gems salesman called as a witness by the Government, testified that his instructions were to sell the films as a package at prices quoted by the defendant. He stated, however, that his superiors never told him that he could not sell less than a package of feature films.

Evidence was offered with reference to negotiations by Screen Gems with television stations, twelve of which resulted in contracts for either the full library or packages of features designated by the defendant. The Government urges that the actual facts with respect to five of these negotiations show that the sales were package sales and were conditioned as such.

In the following instances the Court finds sufficient evidence of conditioning to establish that the contracts in question were block booked in violation of the Sherman Act:

(1) Station WTOP concluded a license dated June 4, 1956 calling for a package of 26 films. Two witnesses, George Hartford and Thomas Jones, participated in those negotiations for the station and testified that they requested the right to select from the package but that their requests were denied. This testimony was contradicted by a representative of Screen Gems, Ben Colman. He testified that the limitation on selectivity was imposed on the station only after WTOP indicated its inability to afford a selective deal. The Court accepts the testimony of the station witnesses.

(2) Station WTOP entered into a second contract with Screen Gems dated September 18, 1956. This contract called for 52 films. The testimony of the station representatives, Hartford and Jones, indicates an attempt on their part to obtain selectivity, and a refusal by Screen Gems to split the packages. Colman, who negotiated this deal for Screen Gems, denied that the station ever requested a more selective purchase. The Court accepts the testimony of Hartford and Jones and therefore finds that this contract was one that was unlawfully conditioned.

The Court rejects the allegation of conditioning in the three remaining contracts upon which the Government relies. In one of these contracts the failure of the Government to answer interrogatories barred the introduction of evidence pertaining to the negotiation of the contract. Because of this, the record is quite barren of facts necessary to establish this contract as block booked.

The evidence relating to the remaining two contracts is not of sufficient weight to allow the Court to find them to have been unlawfully conditioned.

Findings of Fact Relating Specifically to the Defendant Associated Artists Productions, Inc.

Associated Artists Productions, Inc., a New York corporation, was engaged in distributing feature films to television. The evidence in the present action was limited to 754 individual titles acquired

by Associated Artists from Warner Brothers in March, 1956, at a cost of $21,000,000.

In order to market these feature films, Associated Artists divided them into 13 packages of 58 features each. The entire library was then offered in these packages which were approximately evenly balanced as to quality. Unit prices were fixed in each market for the packages but no prices for individual titles were set initially. Associated Artists' salesmen were instructed that if a television station wanted to license a selection of features from one or more groups the negotiating salesman was to call Mr. Rich, general sales manager of Associated Artists. Mr. Rich would then fix a price for such selections. The distributor did not publicize this policy of permitting negotiations for selective features but left the initiative to the stations to make inquiry along those lines.

There is no doubt that the policy of Associated Artists was to sell in blocks if possible. The sales manager in a memorandum to the sales group pointed out that one salesman was "really holding firm on a big one in Los Angeles where he is selling group by group and *NOT* permitting the stations to select pictures."

Defendant's witnesses testified that Associated Artists' policy was to set a price for any number of pictures selected by a station: the unit price would depend on the quality of the films chosen. If the parties could agree on price a selective deal was consummated.

However, Government witnesses contradicted this testimony indicating that in negotiations with Associated Artists they were advised that films had to be licensed in groups or not at all. A summary of contracts entered into from April 1956 to October 1958 shows that a total of 221 contracts were executed during this period. Of these, eighty-three consisted of purchases for other than single or multiple units of 58 features.

On October 17, 1958 Associated Artists sold all of its assets and ceased its film distributorship. It is not now engaged in the distribution of films.

The Government charges that contracts with eleven stations were block booked in the period from April 1956 to October 1958. It is contended that during the course of negotiations these stations were refused the right to negotiate for selected features of their own choice.

In four cases Associated Artists indicated a willingness to permit selectivity at a price substantially higher than the average price per title charged for the package as a whole, at which point these stations did not counter offer to license any selected titles. (Stations WARM, KTNT, WTCN, WWLP).[6] Since the stations could have selected films out of the packages at a price which was not unreasonable, these contracts are not found block booked.

The Court finds that the following contracts were block booked:

(1) Station WJAR, of Providence, Rhode Island, concluded a license on September 27, 1956. The program manager at the station testified that he asked that certain films considered undesirable by the station be dropped from the packages being offered and was informed that the entire package had to be accepted. Associated Artists' refusal to split packages was directed at requiring the television stations to license less desirable films as a condition to licensing better films.

(2) Triangle Publications, Inc., owner and operator of stations WFIL of Philadelphia, Pa., WFBG of Altoona, Pa.,

---

6. E. g., WTCN executed a contract on June 4, 1957 for six packages. They were told they could select films at $4,000 or $5,000 per title. Instead they bought the packages at an average cost of $1,300 per title.

WWLP's contract of August 21, 1957 for seven packages carried an average price of $175 per picture. An offer of selectivity at $600 per picture was rejected by the station.

WLBR of Lebanon, Pa., WNBF of Binghamton, N. Y., and WNHC of New Haven, Conn., concluded a license dated January 18, 1957. Triangle's television director testified that he expressed a desire not to purchase some of the titles offered in the pre-selected packages of 58 and was told by Messrs. Kalman and Hyman of Associated Artists that any number of packages could be purchased but that each package must remain intact without cross-selection. Thereafter a full library contract was executed.

(3) The contract executed with WMAR of Baltimore, Maryland, on June 18, 1957, is a case of unlawful block booking, despite the right of what might be called horizontal selectivity. The Warner Brothers films were divided into three categories by Associated Artists. They were designated "A," "B" and "C" and were priced according to quality. The station was permitted to select individual features from each of the three classes. Mr. Stickle, WMAR's film director, testified that he was not interested in the "C's" but had to purchase them since that was the only way Associated Artists would sell him the "A" films he needed. Mr. Stickle's testimony of conditioning was categorically denied by the Associated Artists' film salesman, Mr. Sussman, who claimed that the station had a right to take or reject any number of films from any of the categories. The preponderance of the evidence supports a conclusion that the WMAR contract for 33 "A's," 34 "B's" and 33 "C's" was block booked.

(4) A similar license was concluded with WTOP of Washington, D. C. Associated Artists offered their films as usual in blocks of fifty-eight. After repeated counter proposals, Associated Artists remained adamant in their refusal to break packages. Finally the station made the following counter offer: WTOP was to license 100 films; Associated Artists was to divide all its pictures into three qualitative categories, "AA," "A" and "B," and separate prices were to be established for the films in each classification; WTOP would then choose an equal number from each category. The final contract, executed on June 17, 1957, was for 99 pictures: 33 "AA's," 33 "A's" and 33 "B's." [7] The contract as executed was precisely the proposal WTOP had made to Associated Artists.

■ Where a contract results from a counter proposal by the station it may be that it is not block booked. But, if the counter proposal is actually a result of conditioning, i. e., a result of the distributor's earlier refusal to sell in units other than blocks, then the later contract is block booked, despite the fact that the proposal came from the buyer.

■ The mere fact that a station has the right of horizontal selectivity does not preclude a finding of block booking. If the distributor requires that a station purchase a given number of lesser quality films as a condition to the sale of the better films, then, regardless of the extent of the right of selection, that contract is block booked. This does not depend upon the number of films to be purchased or even the apparent balance or imbalance of the portions. The vice is conditioning—forcing the sale of one thing as a prerequisite to the sale of another.

There is not sufficient evidence relating to the remaining contracts to support a finding of block booking.

Findings of Fact Relating Specifically to the Defendant National Telefilm Associates

National Telefilm Associates (hereinafter referred to as "NTA"), a New York corporation, has been engaged in the distribution of feature films to television stations since April, 1955. NTA did not produce any of the 770-odd feature films marketed by it, but acquired rights for television distribution from the producers or other owners.

The marketing practice adopted by this defendant was to offer its film product to television licensees in "balanced"

---

7. It was elicited that this balanced selection was a result of prior considerations.

packages averaging 50 to 60 pictures, i. e., each containing an equal selection of both high and low quality features.[8] Film salesmen were provided with an asking price for each package in a particular market, and were instructed to sell the entire package. No prices for individual features included in these packages were made available, nor did the defendant ever announce to the television industry that it was willing to negotiate on a selective basis. If a station wanted a selection of features, NTA salesmen were to obtain an offer for the selective purchase and to consult the home office for final approval.

Charles B. McNamee, a former NTA salesman, testified that he was instructed to sell particular packages at prices fixed by the defendant in each market. If a station offered to license a selection of features, he was told never to refuse to negotiate on such a basis; instead he was to obtain an offer for the selected group which would then be cleared by his superiors.

Evidence was offered with reference to 46 separate negotiations with television stations throughout the country, 42 of which resulted in the formation of contracts for various packages of features. The Government urges that 24 of these latter contracts were package sales and conditioned as such.

The Court finds that in negotiations with the following stations NTA refused to comply with station requests to license fewer films than were contained in proposed packages. These refusals were directed toward requiring the licensing of films other than those requested as a condition to licensing the films desired:

(1) Station WMAR, of Baltimore, Maryland, entered into a license for a package of films on February 17, 1956.[9] WMAR's vice president and WMAR's film director testified that the station wanted only the Selznicks. They were told, however, that in order to get the Selznicks, they would have to buy 24 "TNT's" and 12 "Fabulous 40's." The station then offered to license the "TNT-Selznick" package only, and was informed that the package was unavailable unless the 12 films from the "Fabulous 40" package were taken as well.

During the course of negotiations, Mr. Stickle testified, NTA offered to sell the ten Selznicks alone for about $61,000, or all 46 pictures for about $62,000. Thereafter WMAR licensed all 46 films.

(2) Station WBRE, of Wilkes-Barre, Pennsylvania, concluded a license on June 12, 1956, for "Fox 52." Mr. Coslett of WBRE testified that the packages were offered in their entirety, and that he requested the right to eliminate some less desirable features. He was told that "Fox 52" was being offered in a package only, whereupon WBRE executed a license for the full 52.

(3) Station WWLP, of Springfield, Massachusetts, concluded licenses for the "Fabulous 40" on June 16, 1955 and for "Fox 52" on August 28, 1956. The testimony of the station's film manager was that the packages were offered in their entirety, and that in response to inquiry as to whether either could be split he was informed that this was not possible.

(4) Station KPIX, of San Francisco, California, executed a full package con-

8. The "Fabulous 40, the "TNT-Selznick," the "Fox 52," the "Rocket 86," the "Big 50" and the "Champagne 58" and "Dream" packages, in that order, were offered for licensing to television stations during the period covered by the complaint.

9. This package consisted of 10 Selznick pictures and 24 additional pictures to be chosen from the "TNT-Selznick" group and 12 to be selected from the "Fabulous 40." The 10 Selznicks may actually be considered as 11, since "Since You Went Away" was a long picture which was divided into two parts to be run in consecutive weeks. It was considered a double picture, thereby resulting in 11 Selznicks. The 12 to be chosen from the "Fabulous 40" were in fact to be selected from only 19 pictures since a competing station had already licensed 21 of the "Fabulous 40."

tract for "Rocket 86" on April 1, 1957. Mr. Pack testified that during the course of negotiations, most of which concerned price, he made a request to eliminate undesirable films from the package and that this request was denied. This refusal to break the package was quite separate from price negotiations and Mr. Pack's request was not a prelude to an attempted price reduction.

(5) Station WJAR of Providence, Rhode Island, entered into a full package contract for "Champagne 58" on January 16, 1958. This package contained 10 or 12 British films which were found to be undesirable by the station. Mr. Horowitz, the program manager, asked whether these might be dropped but NTA refused, saying that the package had to be sold as a package and that no pictures could be deleted. The contract as eventually executed contained a right of rejection under which WJAR could refuse to take any three films. Mr. Horowitz' request to delete 10 or 12 films was made in addition to the already obtained limited right of rejection.

Evidence relating to other NTA contracts offered by the Government is insufficient for the Court to find that they were block booked. At the same time, the fair preponderance of the evidence does not ineluctably lead to a conclusion that these contracts are not block booked. We therefore make no finding as to these contracts.

A word concerning the Court's finding in two cases may be helpful.

The Government contended that four contracts executed by Storer stations on June 19, 1957 were block booked.[10] Mr. Storer testified that he had never requested splitting or making substitutions in the "Big 50" in any market. Clearly none of the contracts was individually block booked. Rather the Government's contention is that NTA conditioned the

sale of films to the Wilmington station (which was beamed at Philadelphia) on the sale to other Storer stations in other markets. If this were true then NTA was engaged in unlawful conditioning. But the Court is unable to accept the Government's argument. NTA's action was not an initial and final refusal to split packages. Rather, it was an impatient refusal to reopen and renegotiate an almost final agreement, reached after many months of negotiations. The suggestion that Storer was forced to and agreed to buy 700 films so that he could obtain 50 is also difficult to accept.[11] In view of NTA's general testimony concerning the Storer contracts and Mr. Goldman's categorical denial of the Government's charge, this Court cannot find that these contracts were block booked.

It was claimed that five contracts[12] with WXEX of Petersburg, Virginia, were block booked. Two witnesses testified for the Government. Mr. Barbet, an independent consultant employed by WXEX, testified that NTA was always willing to split the package so long as the station was willing to pay the necessary price. It was his feeling that "dependent upon the number of features and the price involved, a selectivity deal could be made." However, due to price considerations he never bought less than the entire package. Mr. Abeloff, the station's film purchaser, testified that each of the five contracts was the result of unlawful conditioning. He said that he bought undesirable films which were included in each package because that was the only way he could get the good films that he wanted. In view of this basic contradiction in the testimony of the witnesses offered by the Government, the Court is unable to find the WXEX contracts block booked.

One of the other negotiations presents a problem not heretofore considered. On

10. The stations leasing the "Big 50" and other films were WPFH, Wilmington, Delaware; WJW, Cleveland, Ohio; WJBK, Detroit, Michigan and WAGA, Atlanta, Georgia.

11. The 50 films for WPFH would have

cost $177,105. Instead a contract for $756,100 was signed.

12. "TNT–Selznick," 3/30/56; "Fox 52," 2/11/56; "Rocket 86," 5/8/57; "Big 50," 11/20/57; "Champagne 58," 1/31/58.

April 29, 1955, WTCN of Minneapolis, Minnesota, entered into a license for the "Fabulous 40." Mr. Kaufman, the program manager of WTCN, testified that the station had asked to be notified as soon as the "Fabulous 40" became available. After negotiations started, he inquired as to the possibility of splitting the package but was told that NTA could not do that *at that time.* He thereafter purchased the entire "Fabulous 40."

Pertinent to the background of the transaction is the fact that, as WTCN knew, there were two competing stations in the area, potential purchasers of the "Fabulous 40." The defense claims that NTA did not "refuse" to split the package for WTCN but merely said before they would split the package they wanted to offer and attempt to sell the full package to the competing stations. Because WTCN did not want to take the risk of having one of its competitors obtain the better films in the package, the station decided it was preferable to take the entire package at once. Thus this, the defense claims, was not a refusal which forced the station to accept a block booked contract but rather merely a reaction in a competitive market where one purchaser wanted to insure his own acquisition.

▇▇▇ A distributor has the right to offer packages of films. Does the distributor, however, have the right to offer in terms of packages and refuse to consider counter offers at least until he has exhausted the possibility of a legal sale of the package to another customer? So long as the refusal is clearly known to the parties to be but temporary, pending negotiations with other customers, and so long as the refusal is not actually a disguised form of conditioning intentionally employed to force the sale of unwanted films, then such actions taken in good faith are permissible. Contracts, as this one, arising from a station's desire not to have any of the films offered to another competitor station are not block booked.

### Findings of Fact Relating Specifically to the Defendant United Artists Corporation

United Artists Corporation (hereinafter called "United Artists") is a Delaware corporation with its principal place of business in New York, N. Y. It was a distributor of independently produced pictures. Prior to 1956 it had limited its activities to theatrical distribution of films, but in August 1956 it began to release for television exhibition a number of films to which it had distribution rights. These films were offered in a package called the "Top 39."

John Leo, general television sales manager of United Artists, testified that their policy was to sell as much product as they could, but at no time to refuse to sell a selected deal. Mr. Leo said that he instructed the salesmen that they were at no time to refuse selectivity; stations were to be given the right to buy certain pictures from one to twenty or thirty, the price to depend upon the number and quality of pictures bought. When a station asked for selectivity the salesmen were instructed to have such station select its pictures, to obtain an offer for them and to submit the proposition to Mr. Leo. Negotiations would then proceed in the usual way.

In March 1957 United Artists began distribution of a second package known as "Award 52." Shortly before this package was offered to the trade, and after institution of this action, a telegram was sent on behalf of United Artists to all television stations, which said, among other things:

> "There is no requirement for you to buy the full 52; as each picture is individually priced."

All licenses thereafter executed had a standard clause inserted which said in part:

> "The Licensee acknowledges that the Distributor offered each motion picture listed in Schedule A separately to the Licensee without conditioning the licensing of one motion

picture upon the licensing of any other motion picture; that the Licensee desires to acquire a license for each motion picture listed in Schedule A, and that the licenses for the several motion pictures listed in Schedule A are included in one license contract for convenience only."

United Artists consummated 418 contracts. Out of these 418 contracts 71 (about 17%) were selective deals in which packages were not sold as a unit.

The representatives of United Artists concede that it was their policy to offer initially only packages at an average price per picture. They admit that they did not discuss the sale of individual titles or less than a complete package unless a station first made overtures for fewer films. However, there seems to be nothing wrong in a distributor offering its goods in a package, if it is ready to negotiate for the individual items, provided the respective purchasers wish to do business on that basis. That the defendant was often ready to negotiate for individual films or for the elimination of films from the package is abundantly clear from the testimony.

The Government urged, with much eloquence, that one of the marks of block booking was the inclusion in the "Top 39" package of a film called "The Jackie Robinson Story," and that this film was forced upon stations in sections of the country which could not play it. However, the contracts, which were introduced in evidence, with television stations in Macon, Ga.; Columbia, S. C.; Richmond, Va.; Birmingham, Ala.; and Shreveport, La., showed that "The Jackie Robinson Story" was eliminated from the group licensed by those stations at the request of the television stations themselves, and that an appropriate reduction in price was obtained as a result of such elimination.

The Government's case against United Artists rests primarily on two propositions: (1) that this company offered its films in groups or blocks: This undoubtedly was true, but standing by itself it is not alone proof of violation of the anti-trust laws; (2) that despite the statements of the officials of United Artists that they were ready to negotiate for less than groups of films this was not the case, as shown by actual negotiations.

The Government introduced in evidence details of negotiations with nine television stations. The testimony as to what actually happened in the negotiations is a mass of contradictions. There was no doubt that certain of the stations felt that certain of the films in the groups were less desirable than others, and so indicated during the course of the negotiations. It may be that in the instances relied upon by the Government the problem involved was not so much that of "conditioning" as it was of "bargaining." The evidence was clear that in certain cases where the stations stood firm on their demand for selectivity they secured selectivity.

In the following cases, however, defendant's representative refused to consider selectivity and conditioned the sale of any of the films on the purchase of the entire package.

(1) Station WAAM, of Baltimore, Maryland, which entered into a license for the "Top 39" on November 21, 1956, indicated to Mr. Leo that it wished to buy only 13 out of the "Top 39." Mr. Killian testified that Mr. Leo would sell only the entire package of 39. Mr. Leo contradicted this version of the events and said that he had never told the station that it would have to buy the entire 39 pictures. The inquiry concerning the 13 films and the eventual contract which was executed were part of the same negotiations. I accept the testimony of the station representative as being accurate.

(2) Station WWLP, of Springfield, Massachusetts, entered into a license dated December 7, 1956. The film director of this station testified that in response to an inquiry as to the possibility of selecting certain titles out of the package, Mr. Leo told him that this could not be

done and that United Artists would not break the package.

A great deal of testimony was given concerning the station's subsequent attempt to eliminate two films. The defense tried to show that United Artists' refusal was reasonable since WWLP wanted to drop these less desirable films and still retain the already negotiated average price. Such a refusal is both legally and economically proper; if the station chooses to take only the better films offered, then it must expect to pay more per picture.

However, the Court's finding that this contract was block booked does not rest on the 37–39 altercation. It rests solely on United Artists' initial refusal to break the package and the contract licensing the full package which resulted therefrom.

(3) Station WHTN, of Huntington, West Virginia, executed a license agreement dated March 3, 1952 for "Award 52." Mr. Bacon testified that WHTN had made inquiry as to the possibility of selecting fewer films from the package, and that the representative of United Artists refused to deal on any basis other than the purchase of the entire package.

The major point in United Artists' defense is that a form telegram was mailed to the station expressing Mr. Leo's willingness to sell less than 52. But Mr. Bacon's explanation of this issue satisfies the Court. In view of the salesman's reiteration of United Artists' refusal to sell less than the package, it was reasonable that Mr. Bacon should not put any credence in the form telegram.

The Government also contended that two contracts negotiated with WTOP of Washington, D. C. were block booked. Relevant testimony was given by Messrs. Hartford and Jones of WTOP and Mr. Leo of United Artists. The Jones-Hartford testimony includes statements which would indicate block booking and conditioning. The testimony is firm and unequivocal. In response to this, Mr. Leo's denial of those statements is categorical and unequivocal. Thus Mr. Hartford

testified that he asked if he could buy less than the 39 films which were called the "Top 39" and that Mr. Leo said the station had to buy all 39. Mr. Leo testified:

"This is not so. We offered 39. We tried to negotiate for 39, but we never refused Mr. Jones, or anyone else, a chance to select.

"The Court: Did he ever ask for a chance to select?

"The Witness: To my recollection, no."

The credibility of Mr. Hartford's testimony is weakened somewhat by the fact that the station, in the contract which it signed, included the statement that:

"The Licensee acknowledges that the Distributor offered each motion picture listed in Schedule A separately to the Licensee without conditioning the licensing of one motion picture upon the licensing of any other motion picture. * * *"

When Mr. Hartford was asked about this provision of the contract which had been initialed by Mr. Jones, he first said he was not aware of the existence of this clause; then that he imagined counsel for the station knew of this clause, and finally that he had told his attorneys that the statement in the clause was false. If the clause in the contract was false, it is strange that a businessman of Mr. Hartford's experience would sign a contract containing a false statement. The testimony of Mr. Hartford is not such that the Court can accept it unreservedly.

Under the circumstances, the Court cannot conclude that it has been established by a preponderance of the evidence that the contracts entered into by WTOP were block booked contracts.

## Conclusion

As appears from the specific findings of fact relating to the particular defendants, the several defendants have each, from time to time and to the extent set forth in the specific findings of fact, li-

censed or offered to license one or more feature films to television stations on condition that the licensee also license one or more other such feature films, and have, from time to time and to the extent set forth in the specific findings of fact, refused, expressly or impliedly, to license feature films to television stations unless one or more other such feature films were accepted by the licensee.

The Court concludes that the actions of the defendants, as aforesaid, constitute violations of Section 1 of the Sherman Act.

### The Relief

The Government seeks certain relief specifically set forth in the complaints. The relief to be granted, the extent thereof, and the reasons for granting or denying the relief sought in the complaints are hereinafter set forth:

 (1) The Government seeks a decree that each defendant "has unlawfully contracted in restraint of interstate trade and commerce in the distribution of feature films in violation of Section 1 of the Sherman Act." In view of the findings of fact and conclusions of law of the Court, such decree should certainly be entered.

(2) The Government seeks an injunction enjoining each defendant "from refusing to license feature films to television stations on a picture-by-picture, station-by-station basis."

 While an injunction should, of course, be granted, the language set forth in the complaints is too broad. The antitrust laws do not require that every owner of a product must be ready to offer such product for sale to anybody interested in purchasing it. United States v. Twentieth Century-Fox Film Corp., D.C.S.D.Cal.1956, 137 F.Supp. 78, 115. Nor do the antitrust laws, or the Paramount decision, prevent the owner of television films from offering them in groups or blocks. The law simply requires that a person may not condition the sale of one product upon the purchase of another product; or the licensing of one television film on the licensing of another television film. Any injunction to that effect would be appropriate. The language of any such injunction should be determined upon the settlement of the decree.

The necessity for such an injunction flows from the facts of the case and the present state of licensing of feature films to the television industry. News accounts indicate that the so-called "Post -1948" films are about to be made available for licensing to the television industry. Certainly we would not want the defendants to follow certain of the procedures which they followed with reference to the "Pre-1948" films and which are found in this opinion to be violations of the antitrust laws.

 (13) The Government seeks, in addition, a decree directing the defendants "to offer to renegotiate the existing contracts entered into between [them] and television stations in the United States so as to give to any such station an opportunity to license defendants' feature films on a picture-by-picture and station-by-station basis." [3]

Such a decree would be without legal foundation. The Sherman Act provides certain precise remedies. In a civil action brought by the Government it may secure an injunction. (15 U.S.C.A. § 25). Private parties injured by antitrust violations may sue (1) for an injunction (15 U.S.C.A. § 26) and (2) for damages, and may recover threefold damages and the cost of the suit, including a reasonable attorney's fee. 15 U.S.C.A. § 15. In other words, the law provides

---

13. A Tentative Statement submitted at the pre-trial hearings describes the renegotiation sought by the Government as follows:

(a) Designation by each television station licensee of rejected films to be eliminated from its license.

(b) Payment by the defendant licensor to the station licensee for each rejected film to be eliminated from its license.

(c) Reasonable reimbursement to the station licensee for any prints it purchased or rejected films eliminated from its license.

that the Government may prevent a continuing violation of the law by securing an injunction and that private parties may be reimbursed for damages resulting from past violations of the law. Nowhere in the statute, however, is there any authority to require a defendant in a government antitrust case to refund that which it has received, even under an illegal contract, and to pay that amount to a private party not a party to the action. As one court has pointed out:

"* * * The Government's responsibility in bringing cases of this nature is to vindicate the public interest in preserving a competitive economy rather than to redress private wrongs and recover damages for injuries sustained by individuals." United States v. Safeway Stores, D.C.N.D.Tex.1957, 20 F.R.D. 451, 456.

It has been urged in the past that the law should be amended to provide such relief for private parties injured by such past violations of the antitrust laws, but such attempts at amendment have failed in Congress. Senator La Follette in 1911 introduced Senate Bill No. 3276 which would have amended the Sherman Act by providing that where a civil action is brought by the Attorney General for violation of the Sherman Act, any person claiming to have been injured by conduct violative of the Act should have the right to intervene in such action and to secure in such action damages to the same extent as if an independent suit had been brought under Section 7 of the Act. See, 47 Cong.Rec. 4183 (1911). This bill failed of passage.

Furthermore it should be pointed out that the trial of this injunction action was not such as clearly to define the respective rights of the television stations and the defendants as to the damages which might be sought. The television stations did not have control of the testimony offered at the trial. There was no opportunity afforded to the defendants to take their depositions as adverse parties before trial. If the television stations are entitled to recoup some money they have an adequate remedy for damages in a suit specifically for that purpose. But we must remember that in such a suit the defendants would be entitled to a trial by jury, which they did not have in the present action. Furthermore, questions of venue, jurisdiction and the statute of limitations would have to be considered in a way that did not arise in the present action.

While the courts have, in the pursuance of their general equity powers, taken action to correct a continuing violation of the antitrust laws, such as by divestiture orders, never before, as far as this Court can ascertain, has the Government sought to require in an injunction proceeding that the defendants reimburse third parties for injuries which the Government contends those third parties suffered as a result of the antitrust violations. Any procedure such as is sought by the Government would require this Court to pass upon the amount of reimbursement to be made to particular television stations, depending upon the value of the licensed films rejected by the television station, as compared with those films which were retained by it. With the hundreds—or possibly thousands—of films that might be involved, it would call upon this Court to spend a substantial part of its time viewing television films and attempting to reach values thereof. To call upon a court in an already overburdened district to spend its time doing this, when the television stations have adequate remedies in their own districts for any damages suffered as a result of violations of the antitrust laws, would place an insurmountable burden on this Court.[14]

The Supreme Court, in United States v. Oregon State Medical Society, 1942, 343 U.S. 326, at page 333, 72 S.Ct. 690, at page 695, 96 L.Ed. 978, said:

14. To require this Court to view hundreds of television films, when the judge who tried the case will not even have a television set in his own home, seems like a fate too horrible to contemplate.

"It will simplify consideration of such cases as this to keep in sight the target at which relief is aimed. The sole function of an action for injunction is to forestall future violations. It is so unrelated to punishment or reparations for those past that its pendency or decision does not prevent concurrent or later remedy for past violations by indictment or action for damages by those injured."

The Court does not believe that the relief of renegotiation sought in the complaints is an appropriate relief in this type of action and therefore such relief should not be included in the decree.

Settle decree in accordance with this opinion.

This opinion shall constitute the findings of fact and conclusions of law in compliance with Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A.