ETHYL GASOLINE CORPORATION ET AL. *v.*
UNITED STATES.

No. 536.   Argued March 1, 4, 1940.—Decided March 25, 1940.

438

*Mr. Dean G. Acheson*, with whom *Mr. H. Thomas Austern* was on the brief, for appellants.

440

*Assistant Attorney General Arnold,* with whom *Solicitor General Biddle* and *Messrs. Hugh B. Cox, James C. Wilson, John Henry Lewin,* and *Samuel E. Darby, Jr.* were on the brief, for the United States.

444

MR. JUSTICE. STONE delivered the opinion of the Court.

The Government brought this suit in the District Court for Southern New York, to restrain appellant, Ethyl Gasoline Corporation, a Delaware corporation, and the other appellants, who are its officers, from granting licenses, under patents controlled by it, to jobbers to sell and distribute lead-treated motor fuel, and from enforcing

provisions in licenses to oil refiners which restrict their sale of the motor fuel to the licensed jobbers, as violations of the Sherman Anti-trust Act. 26 Stat. 209, 15 U. S. C. § 1, as amended August 17, 1937, 50 Stat. 693. The trial court granted the relief sought and from its decision in favor of the Government the case comes here on direct appeal under the provisions of § 2 of the Expediting Act of February 11, 1903, as amended 36 Stat. 1167, 15 U. S. C. § 29; § 238 of the Judicial Code, as amended 43 Stat. 938, 28 U. S. C. § 345.

The case was tried on an agreed statement of facts which was incorporated in the findings of the trial court and, except as noted, there is no dispute as to the facts. The appellant corporation is engaged in the manufacture and sale of a patented fluid compound containing tetra-ethyl lead, a poisonous substance, which, when added to gasoline used as a motor fuel, increases the efficiency of high pressure combustion engines in which the fuel is consumed. The Ethyl Corporation owns two patents covering the composition of the fluid, No. 1,592,954 of July 20, 1926, and No. 1,668,022 of May 1, 1928. It has a third patent, No. 1,573,846 of February 23, 1926, claiming a motor fuel produced by mixing gasoline with the patent fluid compound, which is claimed also by the two patents first mentioned. It also has a patent, No. 1,787,419, of December 30, 1930, claiming a method of using fuel containing the patented fluid in combustion motors. The corporation manufactures and sells the patented fluid to oil refiners, solely for use in the production of the improved type of motor fuel. It issues licenses under its patents to refiners and to jobbers of motor fuel on terms and conditions presently to be noted, but it does not charge or receive any royalty for its licenses. It derives its profit solely from the sale of the patented ethyl fluid to its refiner licensees.

*The Licensing Agreements.*

Appellant grants licenses under its patents to most of the large oil refining companies in the United States, to manufacture, sell and distribute motor fuel containing the patented fluid. The licenses provide that appellant will sell to the licensees their requirements of the patented fluid. They prohibit the licensees from selling the manufactured product to any except to other licensed refiners, to jobbers licensed by appellant and to retail dealers and consumers. They require the licensed refiners to mix the patented fluid with the gasoline at their refineries with equipment approved by appellant and in conformity to regulations promulgated by the Surgeon General of the United States and any other governmental body having jurisdiction. The refiners agree to impose obligations on all purchasers to conform to such health regulations and to require them to impose like obligations on those to whom they sell. The refiners agree, upon notice by appellant, to discontinue sales to other refiners or jobbers whose licenses appellant has cancelled. The licenses also provide for the maximum amount of the fluid to be used in the gasoline; and that, within that limit, the licensees' regular or "best non-premium" gasoline shall have a maximum octane rating of 70 [1] and shall be sold as the next highest priced motor fuel of the

---

[1] The utility of lead-treated gasoline for use in high compression engines is expressed in terms of octane numbers, an arbitrary scale of measurement indicating the relative degree of compression to which the fuel may be subjected without causing "knock" in the engine, which is prevented or reduced by the use of the fuel. The octane rating of motor fuel increases with the amount of the patented fluid added to the gasoline which, in any case, is small. Appellant's licenses to refiners authorize the manufacture of gasoline of high octane rating, 68 or more, of two classes, "regular," in which there is one part of tetraethyl lead to 4200 parts of gasoline, and "ethyl gasoline," in which there is one part of tetraethyl lead to 1700 parts of gasoline.

licensee below the licensee's ethyl gasoline, which shall have a minimum octane rating of 76 and shall be sold at a certain fixed price differential above the average net sales price of the licensees' best non-premium grade of commercial gasoline. The licenses further provide the conditions under which the name of the Ethyl Corporation and its trademark or trade names may be used in connection with the advertising and sale of the patented motor fuel.[2]

Jobbers are generally required by appellant to apply for licenses through the refiners from whom they expect to purchase the motor fuel. The licenses to jobbers purport to grant the right to sell and deliver to retail dealers and consumers within a specified territory regular and ethyl gasoline, manufactured and sold by a designated licensed refiner.[3] The licensed jobbers are required to furnish appellant monthly with a list of all places at which the motor fuel is sold under the licenses. They agree to comply with health regulations relating to the handling of the motor fuel promulgated by the Surgeon General or other governmental agency; to post and distribute any notices concerning the handling of such 'fuel as required by the appellant; to permit physical examination of employees, and to require customers purchasing for resale to assume similar obligations. Adulteration and dilution of motor fuel distributed under the licenses is prohibited, and requirements similar to those contained in refiner licenses are imposed with respect to the use of

---

[2] The name of the Ethyl Corporation and its trademark or trade names "Ethyl" and "Q" may not be used in connection with the advertising and sale of regular gasoline. All the licensees, with the exception of the Standard Oil Company of New Jersey, which markets the product under the name "Esso," are required to used the word "Ethyl" in connection with the sale and distribution of the Ethyl gasoline.

[3] The only obligation which the licensor assumes toward the jobbers is to defend them against patent and trademark infringement suits.

appellant's corporate name and trade names in connection with the advertising and sale of the motor fuel. Appellant is given the right to cancel the jobbers' licenses at any time for failure to comply with their terms, and either party may cancel, with or without cause, on thirty days' written notice.

*Effect of the Licensing Agreements on the Oil Industry.*

The licensing system established by appellant affects and controls the business of the major part of those engaged in manufacturing and distributing motor fuel oil in the United States. Appellant issues licenses to 123 refiners, including every leading oil company, except one, the Sun Oil Company, which does not generally do business through jobbers. They refine 88% of all gasoline sold in the United States, and the gasoline processed by them under the license agreements is 70% of all the gasoline thus sold, and 85% of all gasoline processed to obtain a high octane rating.

Any jobber in the United States desiring to sell lead-treated gasoline must secure a license from the Ethyl Corporation, revocable at its will, before it can procure the gasoline from licensed refiners. Of the 12,000 jobbers doing business in the United States approximately 11,000 are licensed by appellant. The jobber must procure a new license on changing his source of supply. The greater part of all gasoline treated with the patented fluid is sold and transported in interstate commerce. It is sold in part through wholesale and retail outlets owned and controlled by the refiners and in part to individual retailers and consumers. A large volume and a substantial part of the whole is distributed through licensed jobbers to whom it is delivered at their bulk storage plants through the channels of interstate commerce.

By their terms, the licensing agreements serve to exclude all unlicensed jobbers from the market, and in the

particulars already mentioned, and in others presently to be discussed, they control the conduct of the business of licensed jobbers in the distribution of the patented motor fuel and enable appellant at will to exclude others from the business. The refiners' licenses also in terms place restraints on the sales price of refiners by establishing the prescribed differential between regular and ethyl gasoline. From this and from the other stipulated facts the Government argues that the control acquired through the licensing agreements over the refiners and jobbers has been used by appellants to control the business practices of the jobbers and particularly to maintain resale prices of the patented motor fuel in unlawful restraint of interstate commerce. In support of this contention it relies upon the long established practice of appellant to refuse to grant licenses to jobbers who cut prices or refuse to conform to the marketing policies and posted prices of the major refineries or the market leaders among them.

## Decision Below and Contentions of Appellants.

The trial court concluded that in view of the indefinite language of the stipulation it was perhaps a permissible, though not a necessary, conclusion that an agreement or understanding for the maintenance of prices existed between the appellant and the jobber licensees. But it considered it unnecessary to decide this issue, since it found that the appellant's licensing practices affecting the jobbers, in conjunction with the agreements and coöperation of the licensed refiners, had been used by appellant as the means of excluding from the market the unlicensed jobbers who do not conform to the market policies and posted gasoline prices adopted by the major oil companies or the market leaders among them, and that appellant uses the control thus established to coerce adherence to those policies and prices generally by the licensed jobbers, and that this restriction upon the industry effected

through the license contracts with refiners and jobbers was not within appellant's patent monopoly, and operated unreasonably to restrain interstate commerce in the processed gasoline.

It concluded that the licensing system was not, as appellant argues, necessary for the protection of such legitimate interests as the patentee had in the protection of the quality of the treated gasoline sold upon the market, and its use by the jobbers with safety to the public health. Appellants were accordingly enjoined from enforcing or attempting to enforce, or including in any subsequent agreement, provisions that refiners shall sell lead-treated gasoline only to licensed jobbers, and from requiring or attempting to require jobbers to secure licenses, and from enforcing or attempting to enforce the provisions of any outstanding jobber licenses. The decree also declared the jobber licenses illegal and required appellant to notify the jobbers that the licenses have been cancelled.

Appellant, insisting that it does not use the jobbers' licensing system to maintain prices, makes two principal attacks on the decree. It urges that the licensing of the refiners and jobbers, the restraints upon the sale of the patented fuel by the refiners, and the restrictions placed upon the jobbers, are all reasonably necessary for the commercial development of appellant's patents and for insuring a financial return from them, and are therefore within its patent monopoly. In any case, it is said that the conditions attached to the refiners' and jobbers' licenses are appropriate and reasonably adapted to the maintenance of the quality of the product and for the protection of the public in its use of a product containing a dangerous poison, and both are essential to the maintenance of the market for the patented fuel, on which the market for appellant's patented fluid depends. And since the jobbers' licenses are a necessary or appropriate

means of protecting the interests of appellant and the public in the quality and safe use of the patented product, it is argued that the decree abolishing the whole system of jobbers' licenses went further than was necessary or proper to prevent such restraint as there may have been exerted on the jobbers with respect to prices and marketing policies.

*Relation of the Licensing Agreements to Price Maintenance.*

For the moment we may lay to one side the particular restrictions enumerated in the contracts of the refiners with jobbers, and turn to the relation of appellant's licensing policy to the maintenance of price policies by the jobbers. While the trial court found no contract or agreement which purports to prescribe resale prices or to exact any price policy of the jobbers, the stipulation of facts shows that appellant, through its patents, its contracts, and its licensing policy, has acquired the power to exclude at will from participation in the nationwide market for lead-treated motor fuel all of the 12,000 motor fuel jobbers of the country, by refusing to license any of the 1,000 unlicensed jobbers, or by cancelling, as it may at will, the licenses of any of the 11,000 licensed jobbers. This we assume, for present purposes, it could lawfully do by virtue of the power conferred by its patent to exclude any or all others from selling the patented product. But it does not follow that it can lawfully exercise that power in such manner as to control the patented commodity in the hands of the licensed jobbers who had purchased it, or their actions with respect to it in ways not within the limits of the patent monopoly; and conspicuous among such controls which the Sherman law prohibits and the patent law does not sanction is the regulation of prices and the suppression of competition among the purchasers of the patented articles. That appellant, by the plan

and scope of its licensing policy, has acquired vast potential power to accomplish that end cannot be doubted. And we think the record supports the finding of the trial court that appellant has exercised that power continuously for a considerable period as a means of control over the price policies of the licensed jobbers.

From the stipulation of facts, it appears that since 1929 appellant has pursued the practice of investigating, through field agents, the "business ethics" of jobbers applying for licenses, and of rejecting such applications upon the adverse report of the agent. Appellant admits that the phrase "business ethics" is used to denote compliance with "marketing policies and prevailing prices of the petroleum industry," which are the "marketing policies and posted prices of the major oil companies or the market leaders among them." Among these is the Standard Oil Company of New Jersey which owns one-half of the capital stock of the appellant.[4] While not all applicants who have failed to maintain prices and marketing policies have been rejected, the record leaves no doubt that appellant has made use of its dominant position in the trade to exercise control over prices and marketing policies of jobbers in a sufficient number of cases and with sufficient continuity to make its attitude toward price cutting a pervasive influence in the jobbing trade.

In many instances, although not in all, an adverse report by the investigator as to the applicant's business ethics has been the sole ground for rejecting his application, and appellant admits that the greater number of applications for licenses which have been denied were rejected because of such an adverse report. In the cases in which licenses have been refused, something less than one-half of the rejected applicants were later granted licenses on their assurance that their marketing practices

---

[4] The remainder is owned by General Motors Corporation and E. I. du Pont de Nemours Company.

would be changed. The total number of rejections for failure to comply with that standard does not appear, for appellant has failed to keep any record of the ground of rejection of applications for licenses, admittedly because it is reluctant to preserve in its records "the extent to which maintenance of prices and marketing policies by jobbers entered into the granting of licenses."

Jobbers' licenses do not appear to have been cancelled because of failures to maintain policies or prices of the major oil companies whenever they have occurred, but it is an established practice of appellant to investigate the business ethics of licensed jobbers in order to ascertain whether they maintain the marketing prices, policies and practices prevailing or ostensibly prevailing in the industry. Representatives of appellant have from time to time, but not in every case, reported a jobber to his supplier or refiner for not maintaining the marketing policies of the latter, and in some cases they have united in persuading the jobber to mend his ways. Appellant has generally required each licensed jobber to purchase all his treated fuel from a single refiner and in some instances has refused a license to jobbers who wished to change their source of supply from one licensed refiner to another.

These long-continued practices have had the effect upon the industry naturally to be expected. Large numbers of refiners and the majority of jobbers believe that the jobbers must maintain the required business ethics in order to obtain licenses, and a number of licensed jobbers believe that they are required by appellant's licensing practices to maintain prices and abide by the marketing practices of the major oil companies. Appellant, in its printed instructions to field representatives as to the manner of conducting investigations of licensed jobbers, after pointing out that one of the reasons for the investigation of the jobber before the issuance of the license

is to insure that he "will not resort to unethical methods in competing with our other licensed jobbers and refiners," and after describing the methods of conducting the investigation,[5] sums up the result as follows: "We have, through these supplemental investigations, been able to correct the ethyl picture to a considerable extent, and have succeeded in eliminating from our jobber lists some of our former accounts who were not a credit to us as licensees of the Ethyl Gasoline Corporation."

*Scope of the Patent Monopoly.*

It is not denied, and could not well be, that if appellant's comprehensive control of the market in the distribution of the lead-treated gasoline, as disclosed by the record, had been acquired without aid of the patents, but wholly by the contracts with refiners and jobbers, such control would involve a violation of the Sherman Act. *Paramount Famous Corp.* v. *United States*, 282 U. S. 30, 43; *United States* v. *First National Pictures*, 282 U. S.

---

[5] The investigator is reminded in the *Field Representative Manual* that the question as to "business ethics" "can be answered only if the field representative has obtained sufficient information to be sure of his opinion." "Ethics of the jobber is based on the territory in which he is marketing and the conditions surrounding the sale of gasoline by other ethyl gasoline distributors. Care should be taken, if possible, to find out the instigator of any practices which tend to unfair competition. Business ethics is a relative quality and no hard and fast rule can be given to govern all cases. Information given to field representatives and picked up in the various contacts should be weighed carefully before a final decision is reached. One of the three words, 'good,' 'questionable,' or 'unethical' is to be used in answering this question."

· In January, 1935 the question as to "business ethics" was eliminated from the form report of field agents. But business ethics has since continued to be one of the principal subjects of investigation and as before, the result of the field agent's investigation has been included in his report and his recommendations have been generally accepted and acted upon by his superiors.

44. Cf. *Frey & Son* v. *Cudahy Packing Co.,* 256 U. S. 208; *Federal Trade Commission* v. *Beech-Nut Packing Co.,* 257 U. S. 441. And so we turn to the consideration of the patents and the patent law to ascertain whether the monopoly which they have given appellant affords a lawful basis for the control over the marketing of motor fuel which the record discloses. Cf. *United States* v. *General Electric Co.,* 272 U. S. 476. In considering that question we assume the validity of the patents, which is not questioned here.

The patent law confers on the patentee a limited monopoly, the right or power to exclude all others from manufacturing, using, or selling his invention. R. S. § 4884, 35 U. S. C. § 40. The extent of that right is limited by the definition of his invention, as its boundaries are marked by the specifications and claims of the patent. *Motion Picture Patents Co.* v. *Universal Film Co.,* 243 U. S. 502, 510. He may grant licenses to make, use or vend, restricted in point of space or time, or with any other restriction upon the exercise of the granted privilege, save only that by attaching a condition to his license he may not enlarge his monopoly and thus acquire some other which the statute and the patent together did not give.

He may not, by virtue of his patent, condition his license so as to tie to the use of the patented device or process the use of other devices, processes or materials which lie outside of the monopoly of the patent licensed; *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.,* *supra;* *Carbice Corporation* v. *American Patents Corp.,* 283 U. S. 27, 31; *Leitch Manufacturing Co.* v. *Barber Co.,* 302 U. S. 458; cf. *United Shoe Machinery Co.* v. *United States,* 258 U. S. 451, 462; *International Business Machines Corp.* v. *United States,* 298 U. S. 131, 140; or condition the license so as to control conduct by the licensee not embraced in the patent monopoly, *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20; *Interstate Circuit*

v. *United States,* 306 U. S. 208, 228–230; or upon the maintenance of resale prices by the purchaser of the patented article. *Adams* v. *Burke,* 17 Wall. 453; *Bobbs-Merrill Co.* v. *Straus,* 210 U. S. 339; *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.,* 220 U. S. 373; *Bauer & Cie* v. *O'Donnell,* 229 U. S. 1; *Straus* v. *Victor Talking Machine Co.,* 243 U. S. 490; *Boston Store* v. *American Graphophone Co.,* 246 U. S. 8; cf. *United States* v. *General Electric Co., supra,* 485.

Appellant, as patentee, possesses exclusive rights to make and sell the fluid and also the lead-treated motor fuel. By its sales to refiners it relinquishes its exclusive right to use the patented fluid; and it relinquishes to the licensed jobbers its exclusive rights to sell the lead-treated fuel by permitting the licensed refiners to manufacture and sell the fuel to them. And by the authorized sales of the fuel by refiners to jobbers the patent monopoly over it is exhausted, and after the sale neither appellant, nor the refiners may longer rely on the patents to exercise any control over the price at which the fuel may be resold. *Adams* v. *Burke, supra; Bobbs-Merrill Co.* v. *Straus, supra; Bauer & Cie* v. *O'Donnell, supra; Motion Picture Patents Co.* v. *Universal Film Co., supra.*

The picture here revealed is not that of a patentee exercising its right to refuse to sell or to permit his licensee to sell the patented products to price-cutters. Compare *United States* v. *Colgate & Co.,* 250 U. S. 300 with *United States* v. *A. Schrader's Son,* 252 U. S. 85. A very different scene is depicted by the record. It is one in which appellant has established the marketing of the patented fuel in vast amounts on a nationwide scale through the 11,000 jobbers and at the same time, by the leverage of its licensing contracts resting on the fulcrum of its patents, it has built up a combination capable of use, and actually used, as a means of controlling jobbers' prices and suppressing competition among them. It

seems plain that this attempted regulation of prices and market practices of the jobbers with respect to the fuel purchased, for which appellant could not lawfully contract, cannot be lawfully achieved by entering into contracts or combinations through the manipulation of which the same results are reached by the exercise of the power which they give to control the action of the purchasers. Such contracts or combinations which are used to obstruct the free and natural flow in the channels of interstate commerce of trade even in a patented article, after it is sold by the patentee or his licensee, are a violation of the Sherman Act. *Federal Trade Commission* v. *Beech-Nut Co., supra,* 453; *United Shoe Machinery Co.* v. *United States, supra; Victor Talking Machine Co.* v. *Kemeny,* 271 F. 810, 817; cf. *United States* v. *A. Schrader's Son, supra.* Agreements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition, *United States* v. *Trenton Potteries Co.,* 273 U. S. 392, and agreements which create potential power for such price maintenance exhibited by its actual exertion for that purpose are in themselves unlawful restraints within the meaning of the Sherman Act, which is not only a prohibition against the infliction of a particular type of public injury but "a limitation of rights which may be pushed to evil consequences and therefore restrained." *Standard Sanitary Mfg. Co.* v. *United States, supra,* 49; *American Column Co.* v. *United States,* 257 U. S. 377, 400; *United States* v. *American Linseed Oil Co.,* 262 U. S. 371; *United States* v. *Trenton Potteries Co., supra,* 397, 398.

The extent to which appellant's dominion over the jobbers' business goes beyond its patent monopoly, is emphasized by the circumstances here present that the prices and market practices sought to be established are not those prescribed by appellant-patentee, but by the

refiners. Appellant neither owns nor sells the patented fuel nor derives any profit through royalties or otherwise from its sale. It has chosen to exploit its patents by manufacturing the fluid covered by them and by selling that fluid to refiners for use in the manufacture of motor fuel. Such benefits as result from control over the marketing of the treated fuel by the jobbers accrue primarily to the refiners and indirectly to appellant, only in the enjoyment of its monopoly of the fluid secured under another patent. The licensing conditions are thus not used as a means of stimulating the commercial development and financial returns of the patented invention which is licensed, but for the commercial development of the business of the refiners and the exploitation of a second patent monopoly not embraced in the first. The patent monopoly of one invention may no more be enlarged for the exploitation of a monopoly of another, see *Standard Sanitary Mfg. Co.* v. *United States, supra*, than for the exploitation of an unpatented article, *United Shoe Machinery Co.* v. *United States, supra; Carbice Corporation* v. *American Patents Corp., supra; Leitch Manufacturing Co.* v. *Barber Co., supra; American Lecithin Co.* v. *Warfield Co.*, 105 F. 2d 207, or for the exploitation or promotion of a business not embraced within the patent. *Interstate Circuit* v. *United States, supra*, 228-230.

*Protection of Health and Quality of Product.*

The trial court was of opinion that such interest as appellant has in protecting the health of the public in connection with the distribution of the fuel, and in preventing adulteration, deterioration and dilution of the motor fuel in the hands of the jobbers may be adequately protected without resort to the jobber license device which has been and is capable of being used for other and illicit purposes. Compare *International Business Machines Corp.* v. *United States, supra*, 139, 140. This

conclusion is, we think, amply supported by the record. The precautions taken to protect the public health in the handling of the motor fuel by jobbers and service stations include the health restrictions imposed on jobbers by the refiners included in their contracts with jobbers, inspections, more or less perfunctory, by representatives of appellant, and the posting by jobbers and distributors of notices supplied by appellant stating that the fuel contains lead and is for use as a motor fuel only. These activities are not interfered with by the decree.

There is no authentic instance of injury resulting from the handling of lead-treated gasoline, after its manufacture, attributable to its lead content. Extensive expert study, carried on under direction of appellant over a period of years, detailed in the record, resulted in a report that the risk arising from the absorption of lead through the skin in the handling of the lead-treated fuel is so small as to be negligible, and that the use of the fuel made in conformity to the refiners' licenses has not caused or produced any dangers or hazards to health.

The avoidance of such dangers as there may be in the handling of the motor fuel by jobbers and distributors is plainly not beyond control by public health regulations, and would seem, as the district court thought, to be amply secured, in any case, through the self-interest of the refiners in requiring the purchasers of their gasoline to take proper health precautions including the posting of notices which appellant supplies and by the continuance of appellant's inspection, all of which are permissible under the decree. It is likewise apparent that the interest the appellant has in preventing dilution, adulteration and deterioration of the treated gasoline in the hands of the jobbers may be similarly protected without continued resort to jobber licenses, which is precluded by reason of their use and the danger of their continued use for other and illegal purposes.

Since the unlawful control over the jobbers was established and maintained by resort to the licensing device, the decree rightly suppressed it even though it had been or might continue to be used for some lawful purposes. The court was bound to frame its decree so as to suppress the unlawful practices and to take such reasonable measures as would preclude their revival. *Local 167* v. *United States,* 291 U. S. 293; *Warner-& Co.* v. *Lilly & Co.,* 265 U. S. 526, 532. It could, in the exercise of its discretion, consider whether that could be accomplished effectively without disestablishing the licensing system, and whether there were countervailing reasons for continuing it as a necessary or proper means for appellant to carry out other lawful purposes. Since the court rightly concluded that these reasons were without substantial weight, it properly suppressed the means by which the unlawful restraint was achieved. *Local 167* v. *United States, supra,* 299, 300; cf. *Merchants Warehouse Co.* v. *United States,* 283 U. S. 501, 513.

*Affirmed.*

MR. JUSTICE MCREYNOLDS and MR. JUSTICE ROBERTS took no part in the consideration or decision of this case.