**UNITED STATES of America,
Plaintiff,**

v.

**STANDARD OIL COMPANY OF
CALIFORNIA, Defendant.**

**No. C–52334.**

United States District Court,
N. D. California.

Oct. 26, 1972.

Judgment Dec. 12, 1972.

Judgment Affirmed June 4, 1973.

See 93 S.Ct. 2750.

See also D.C., 330 F.Supp. 371.

**1332**

Bernard M. Hollander, Donald H. Mullins and Alan B. Pick, Antitrust Division, Dept. of Justice, Washington, D. C. and Anthony E. Desmond, Antitrust Division, Dept. of Justice, San Francisco, Cal., for plaintiff.

William E. Mussman, Thomas J. Klitgaard and Charles A. Storke, of Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CONTI, District Judge.

### INTRODUCTION

The Findings of Fact and Conclusions of Law are, where appropriate, followed by reference to exhibits, transcript testimony page numbers and legal authorities.

### FINDINGS OF FACT

I.  1.  *Jurisdiction and Venue*

This is an action by the United States under Section 4 of the Sherman Act (15 U.S.C § 4) to have the court adjudge that Standard Oil Company of California (hereinafter "SoCal") has engaged, since at least 1956, in a continuing combination and conspiracy to unreasonably restrain and to monopolize the distribution and sale of petroleum products in American Samoa, and adjudge that SoCal has entered into and utilized long term requirements contracts with the primary non-governmental consumers of the major petroleum products used in Samoa (diesel fuel and aviation fuel) all in unreasonable restraint of trade, in violation of Section 3 of the Sherman Act (15 U.S.C. § 3), and to have the court enjoin the maintenance, continuation or resumption of said violations and grant mandatory relief.

2.  Defendant SoCal is a corporation organized and existing under the laws of the State of Delaware with its principal offices in San Francisco, California. It transacts business and is found within the Northern District of California. [GX 1(2), (3); GX 2(9)].

3.  SoCal is engaged in trade and commerce in the Territory of American Samoa and between that Territory and states or foreign nations. [GX 1(3-5)].

4.  The amount of trade and commerce involved in the sale and distribution of petroleum products in American

Samoa is substantial. [GX 1(6); Amended GX 23; Amended GX 24].

## II. *Description of the Defendant*

5. SoCal engages in exploration, production and transportation operations with respect to crude oil, and in refining, manufacturing, marketing, shipping and research operations with respect to refined petroleum products in the United States and in certain foreign countries. [GX 1(3)].

6. SoCal has, since July 1956, been virtually the only supplier and distributor of petroleum products in the Territory of American Samoa [GX 2], where it sells diesel fuel, aviation gasoline and jet fuel, gasoline and oil products for automobiles and other petroleum products, all of which are transported to American Samoa by tanker from SoCal's refinery and plant in Hawaii. [GX 1(5); GX 14].

7. The bulk of SoCal's sales in American Samoa since 1956 has been diesel fuel sold through the two canners (Van Camp Sea Food Company and Star-Kist Foods, Inc.) for use by their foreign tuna fishing fleets and to the Government of American Samoa ("GAS") for the generation of electricity for the Territory, and aviation fuels sold to Pan American World Airways and to the United States Government for its military planes. [D–41, A, D–41 B, D–41 C, D–41 D].

## III. *SoCal's Course of Conduct in American Samoa.*

A. *The Combination or Conspiracy to Unreasonably Restrain and Monopolize Trade and Commerce.*

1. *SoCal's Relationship with GAS*

8. From its first consideration of entry into the Samoan market, SoCal intended to establish and maintain a monopoly position there. [D 3 G (S 605T)]

9. SoCal's petroleum products are stored in American Samoa in a tank farm owned by the Government of American Samoa, and in storage facilities at Tafuna Airport erected on GAS land, all of which storage facilities have been used, occupied and controlled by SoCal under a Permit and Agreement dated July 16, 1956, the term of which ran for 10 years from July 1, 1956, renewable at SoCal's option for four additional terms of 10 years each. [GX 1(5); GX 9(2)].

10. In the negotiations between SoCal and GAS which preceded the Department of Interior's approval of the Permit and Agreement of July, 1956, then-Governor Lowe and then-Attorney General Coleman, at SoCal's behest, failed to follow "fitting and proper" procedures: [TR 937]

10(a) Normal procedures for disposal of surplus Government property were not followed. [TR 747].

10(b) Despite the fact that Standard-Vacuum (hereinafter "Stanvac",) which had previously supplied petroleum to Samoa, had asked to be and had been assured that it would be considered as a lessee of the tank farm, SoCal was permitted to formulate the conditions under which Stanvac would be permitted to make an offer, and was permitted to begin direct negotiations with the Attorney General of Samoa prior to the expiration of the time within which Stanvac was to respond. [GX 254, pp. 1–2; TR 752].

10(c) Stanvac's cabled offer of a capital investment was higher than SoCal's initial offer. Lowe and Coleman reported the terms of Stanvac's offer to SoCal and permitted it to alter the terms of its proposal "to give the Governor evidence to show that [its] offer was higher than Stanvac's offer". [GX 254, p. 3; TR 755].

10(d) Although its cabled offer appeared preferable to SoCal's in several other respects, Stanvac was not granted the one month

extension which it requested to receive an engineer's report then enroute and to finalize its offer. [D–3 Q; TR 753–759].

10(e) The agreement negotiated with SoCal was for a maximum term of 50 years, while Stanvac had suggested a maximum term of only 20 years. [GX 254, p. 2].

10(f) The agreement negotiated with SoCal contained a maximum annual rental of $17,500, while Stanvac had suggested a rental based on volume with no maximum. [GX 254, p. 2].

10(g) Governor Lowe informed the Interior Department that So-Cal's offer was better than Stanvac's, without revealing that SoCal had been given special treatment by being allowed to increase its initial bid. [D–3 Q].

11. Had Adolf Edward, Jr., Interior's Associate Solicitor for Territories, who was responsible for reviewing the proposed agreement between SoCal and GAS, been aware of the irregularities in the negotiation procedures used in Samoa, he would not have approved of them. [TR 935–937, TR 941–942].

12. The Permit and Agreement of July, 1956, between GAS and SoCal was cancelled by Governor H. Rex Lee on the advice of Interior officials including the Assistant Solicitor on August 11, 1961, "to the extent that it is provided in Article I that such permit will be construed as a lease should the title to the property involved pass from the United States to the Government of American Samoa." [TR 181–184; GX 241, GX 241 A, GX 241 B, GX 242].

13. Said cancellation was never rescinded nor was any lease with SoCal ever signed by Governor Lee. [TR 188].

14. Because said cancellation was never rescinded, nor any lease with So-Cal subsequently signed, the Permit and Agreement of July, 1956, between GAS and SoCal did not ripen into a lease

agreement as would have occurred had said cancellation not been made. [GX 257, GX 243, GX 244, GX 245, GX 245 A & B].

15. No formulation of prices to be charged in American Samoa by SoCal is contained in the Permit and Agreement of July, 1956. The only such formulation is contained in a unilateral letter from SoCal to GAS which is not incorporated or referred to in said Permit and Agreement, and which bases Samoan prices upon the level of domestic posted prices in Richmond, California, over 4,500 miles away. [D–3–0].

16. The only provision in the Permit and Agreement of July, 1956, providing for escalation of the maximum annual rental of $17,500 for use of GAS' storage facilities, ties any such escalation to the price of crude oil in Richmond, California, and bears no relationship to volume usage of the facilities which has increased markedly since 1956, while crude oil prices in Richmond, California, remained relatively stable. [GX 9; TR 925].

17. Each year since the fiscal year July 1, 1962–June 30, 1963, SoCal's usage of GAS' storage facilities has exceeded the volume which requires a maximum rental payment, but because of the maximum rental provision in the Permit and Agreement of July, 1956, only $17,500 has been paid to GAS by SoCal. [GX 10a].

18. Normal rental for a comparable bulk storage plant would be closer to $100,000 per year than $17,500 per year. [TR 2603, TR 2605–6].

19. In 1961, the Permit and Agreement of July, 1956, was used by SoCal in furtherance of its aforesaid continuing combination and conspiracy, to dissuade Shell Oil Company of New Zealand from constructing or leasing storage and fueling facilities at Tafuna Airport in American Samoa, with the effect of permitting SoCal to maintain its monopoly in American Samoa: [TX 253, GX 253 A–D]; TR 783–798, TR 963–966].

19(a) In about February, 1961, SoCal refused to work out an arrangement with Shell to allow Shell to supply TEAL (now Air New Zealand) with aviation fuel at Tafuna Airport. [GX 253 AA].

19(b) When Shell sought to construct its own storage and pumping facility at Tafuna Airport, then-Governor Coleman took the position, after consultation with SoCal, that SoCal had the "exclusive right to install fueling equipment and to service all aircraft using the field." [GX 253].

19(c) Shell never entered the aviation fuel market in Samoa except by arrangement with SoCal. [TR 791–792; GX 37, GX 38].

19(d) Because of the high price of aviation fuel supplied to Air New Zealand at Tafuna Airport, Air New Zealand no longer uplifts aviation fuel at that point, but instead fuels its planes at Nadi, Fiji. [GX 12, GX 10; TR 514–515, 519].

## 2. *SoCal's Relationship with the Canners*

20. Contingent upon the execution of the Permit and Agreement of July, 1956, between GAS and SoCal, Van Camp Sea Food Company ("Van Camp"), a tuna canner and processor in Samoa which itself used only small quantities of diesel fuel, entered into a 10 year requirements contract with SoCal dated June 21, 1956, which assured that no less than 60% and as much as all of Van Camp's monthly operational requirements of petroleum products in American Samoa, including as a practical matter the requirements of the foreign fishing fleets serving Van Camp there, would be provided by SoCal. [GX 26 IV, D 14 A, GX 28; TR 1251–1274].

21. The 1956 requirements contract between Van Camp and SoCal provided no advantage to Van Camp but had the effect of foreclosing competitors from Van Camp's business.

22. Star-Kist Foods Inc. ("Star-Kist"), then a new tuna canner and processor in American Samoa which itself used only small quantities of diesel fuel, entered into a 10 year requirements contract with SoCal, effective September 1, 1963, which assured that no less than 60% and as much as all of Star-Kist's monthly operational requirements of petroleum products in American Samoa, including as a practical matter the requirements of the foreign fishing fleets serving Star-Kist there, would be provided by SoCal. [GX 30(IV)(c), GX 33, GX 34; TR 3036–3039].

23. The 1963 requirements contract between Star-Kist and SoCal provided no advantage to Star-Kist but had the effect of foreclosing competitors from Star-Kist's business.

24. Van Camp since 1956, and Star-Kist since 1964 have informed SoCal in detail of competitive activity in or relating to Samoa, and have thus aided SoCal in maintaining its monopoly position.

24(a) In October, 1956, when Moore of Van Camp learned that the Japanese fishing fleets were threatening, because of SoCal's high price for lubricating oil, to import such oil from Japan, he notified SoCal, which reduced the fleets' price by almost one-third and thus prevented the supply of such oil from another source. [GX 41, GX 42, GX 43].

24(b) In November 1960, after SoCal had four times increased its diesel fuel prices (by 0.5¢ per gallon in November, 1956 and January, 1957, by 0.3¢ per gallon in June, 1957 and February, 1959), and Gillis of Van Camp had notified SoCal that because of SoCal's high diesel fuel price, a Japanese fleet was threatening to bring such fuel from Japan, SoCal degraded its diesel fuel and reduced the fleet

price by 0.5¢ per gallon, and thus prevented the supply of such fuel from another source. [D 41 N, D 41 NA, D 41 M; GX 45, GX 46].

24(c) During 1964, Star-Kist, which had by now begun operations in American Samoa, joined Van Camp in reporting the activities of potential competitors in Samoa to SoCal. [GX 143 B, GX 63, GX 62].

24(d) In mid-1964, Star-Kist discouraged Mobil's attempt "to cut in on some of Standard Oil's monopoly in the South Pacific." [GX 181].

24(e) In July 1964, Moore of Van Camp, in reporting a renewed threat by the Japanese fishing fleet to import diesel fuel from Japan because of SoCal's high prices, told SoCal that Van Camp was not trying to beat down the market price, but was interested in SoCal's retaining the business it enjoyed in American Samoa. [GX 57].

25. In October, 1964, Governor Lee, who had no intention of protecting SoCal's monopoly position in American Samoa, expressed to SoCal his concern about its Samoan prices and told SoCal that other oil companies were exploring the Samoan market without revealing their names or any details. [GX 236, GX 64].

26. In February, 1965, recognizing that there was a serious threat to its monopoly position, SoCal effected a general price reduction in petroleum products in Samoa.

*The July 1, 1965 Price Reduction for Samoan Diesel Fuel Special (SDFS)*

27. In about December, 1964, the canners, because of continuing pressure from the fishing fleets over SoCal's monopoly prices, ostensibly considered joining forces with GAS to establish a second fuel storage facility in Samoa. [GX 216, GX 217, GX 220, GX 222, GX 224].

28. The matter was discussed at meetings between Governor Lee and representatives of the canners in January, March and June 1965. [D 21 K, GX 240; TR 239].

29. Governor Lee suggested that the canners finance the facility and have the Samoan Development Corporation, which had been organized to promote economic development in Samoa, manage the facility and sell fuel products. Bids would be invited on a world-wide basis for the supply of petroleum products for each three year period. Any company, including SoCal, would then have had an equal chance to bid. [TR 234–235 A; TR 1299].

30. There was no understanding between the parties involved that the plan for a second fuel facility would be leaked to SoCal before it was finalized, and Governor Lee understood that until the papers had been signed, the plan would be held in strictest confidence. [GX 240; TR 241; TR 1806, lines 22–24; TR 1866, lines 16–20; TR 2054, lines 7–16; TR 3045, lines 14–25].

31. On June 9, 1965, representatives of Van Camp and Star-Kist met with Governor Lee in Los Angeles, and led him to believe that they were going to go ahead on the second facility. [TR 240].

32. On June 11, 1965, two days after the Los Angeles meeting and only one day after the proposed agreement [GX 71] was distributed to the three participants, Gillis of Van Camp advised Evans of SoCal that there were plans for other fuel facilities [GX 68], that Van Camp had been solicited by other suppliers at a more attractive price than SoCal's for diesel fuel [GX 66], and that it would take a 2¢ per gallon cut in the price of SDFS to "put out the fire" and "hold Van Camp's business." [GX 67, GX 68].

33. When SoCal on July 12, 1965, met Gillis' condition and agreed to drop the price of Samoan Diesel Fuel Special ("SDFS") by 2¢ per gallon effective July 1, 1965, Van Camp, which had giv-

en notice on May 25, 1965, of its intention to terminate its existing ten year requirements contract with SoCal, agreed in principle to a new five year requirements contract with SoCal. [GX 67, GX 74, GX 79 A, GX 39, p. 2].

34. SoCal's 2¢ price reduction for SDFS was made as an inducement for Van Camp's contract renewal and with an .awareness by SoCal that this would destroy the plan for a new storage facility. [GX 39, p. 2; GX 267, pp. 74–75; TR 445–446; TR 1295–1296].

35. The price reduction by SoCal was made because SoCal had learned from Van Camp that the canners and GAS might otherwise secure a competitive supply. SoCal had also learned from Van Camp that Mobil and Shell were considering entering the market and SoCal made the reduction to prevent entry by them or any other supplier. [TR 1295–1296; GX 263, pp. 84–85; GX 267, pp. 72–75; GX 66, GX 70].

36. SoCal's price reduction on SDFS from 14.95¢ per gallon to 13.95¢ per gallon, effective February 1, 1965, plus its reduction from 13.95¢ per gallon to 11.-95¢, effective July 1, 1965, constituted a 20% reduction in the price of SDFS during a 6-month period. [D–41 M].

### 3. SoCal's Additional Acts in Furtherance of the Conspiracy

37. As early as 1963, SoCal attempted to enter into a five year contract with GAS for its power plant requirements. [GX 48; TR 217–218].

38. In July 1965, when SoCal granted the canners the 2¢ price reduction in the price of SDFS, it withheld that reduction from GAS in an unsuccessful attempt to force GAS into a five year requirements contract. [GX 78; TR 249–250].

39. In July 1965, SoCal also offered to construct new storage tanks and fueling facilities on the industrial side of Pago Pago Bay without, however, relinquishing control over the existing facilities, if GAS would agree to enter into a ten year requirements contract effective when the new facilities became operational. [GX 78; TR 249–250; TR 259].

40. Since GAS was adamant in its refusal to enter into a requirements contract with SoCal and continued to seek a second supplier, SoCal, in October 1965, finally granted GAS the 2¢ reduction "with the hope of stopping any further negotiations with other companies". [GX 39].

41. Between 1963 and 1966, SoCal opposed the installation, at GAS expense, of duplicate fueling facilities under the fuel pads at Tafuna Airport, which installation assured potential competitors access to the airport. [TR 256; TR 1741–1744; GX 86–89].

42. Between 1966 and 1968, SoCal made several efforts to obtain additional fuel storage space at Tafuna Airport, even though it had no immediate need for it. [TR 257; GX 91–96].

43. In 1966, SoCal sent a representative to Tokyo as part of "our efforts to secure contracts with Japan, Korea and Chinese fishing fleets in Samoan waters serving Van Camp and Star-Kist". [GX 99].

44. SoCal decided that requirements contracts directly with the foreign fishing fleets were unnecessary because "Standard has exclusive contract with Van Camp/Star-Kist therefore it will not change situation even users signed with Standard exclusively". [GX 103].

45. In addition to its entry into requirements contracts with the canners, SoCal entered into similar contracts with Pan American World Airways ("Pan Am"), the major user of aircraft fuel at Tafuna Airport. [TR 1225–1229].

### B. SoCal's Illegal Requirements Contracts

#### 1. Requirements Contracts with the Canners.

46. The 1956 SoCal-Van Camp contract, which by its express terms required Van Camp to purchase at least 60% of its monthly requirements of pe-

troleum products from SoCal, called for SoCal to deliver the petroleum products to Van Camp's premises and "to vessels at the oil docks in Pago Pago." [GX 26(IV)].

47. Star-Kist and SoCal signed a similar ten year requirements contract effective September 1, 1963. [GX 30].

48. Effective July 1, 1965, SoCal entered into a new five year requirements contract with Van Camp similar to their 1956 agreement, but which sets forth a specific price of 11.95¢ per gallon for SDFS, the marine diesel fuel used by the fishing fleets but not by Van Camp, and the only product price specifically set forth in this contract. [GX 26 (July 1, 1965, V), TR 1264–1266].

49. Effective July 1, 1965, SoCal amended Star-Kist's requirements contract by reducing the price of SDFS to Star-Kist's fishing vessels to 11.95¢ per gallon. [GX 32].

50. The canners receive tuna from Korean, Nationalist Chinese and Japanese fishing fleets which require that an adequate supply of diesel fuel be available to them at Pago Pago. The canners purchase SDFS from SoCal which pipes it directly from the storage facilities to the fishing boats. The canners sell the fuel to the fleets on credit. [GX 18, TR 508, TR 1252].

51. As a result of the relationship between the fleets and the canners and the requirements contracts between the canners and SoCal, the fleets have since the signing of the contracts, purchased virtually 100% of their requirements from SoCal. [GX 16, GX 17].

52. The canneries themselves use very small quantities of fuel oil. [TR 1253; GX 18].

53. The July 1965 price reduction by SoCal in the price of SDFS to the canners was made "in exchange for their renewing our products contract." [GX 39, p. 2; TR 1267–1270].

54. SoCal believed that by reducing the price of SDFS in July 1965, it would keep SoCal in business with the fishing fleets and dissuade Mobil, Shell or any other supplier from entering the market. [TR 1267–1270].

55. SoCal considered that the requirements contracts were for the requirements of the fleet, and that they gave SoCal "a valid business hold" on the fleets' requirements. [D 14 A; TR 1273–1274].

56. SoCal and the canners amended the requirements contracts to permit the fleets to be fueled at Tahiti, where the canners had no canneries. [TR 1257–1258; GX 28, GX 34, GX 265, GX 266].

57. Because of the requirements contracts, competitors of SoCal were dissuaded from entering the market. [GX 151, GX 177, GX 185].

2. *Requirements Contract with Pan American.*

58. From the time when American Samoa was added as a supply point on the aviation fuel contract between SoCal and Pan Am until the present, Pan Am has been obligated to take some and as much as all of its requirements of aviation fuel at Tafuna Airport from SoCal. [TR 1225–1229].

59. Effective January 1, 1963, SoCal entered into a contract whereby Pan Am for four years was obligated to take all of its requirements of aviation engine fuel at Tafuna from SoCal. [TR 1225].

60. Although the wording of the requirements contract between SoCal and Pan Am was modified in December 1966, Pan Am continued to take all its requirements at Tafuna from SoCal. [TR 1228].

61. Effective January 1, 1969, the contract was amended to obligate Pan Am to take no less than two-thirds, and as much as all of its requirements at Tafuna from SoCal. [TR 1227].

C. *Effects of the Illegal Combination and Conspiracy and the Illegal Requirements Contracts.*

62. SoCal has been able to maintain extremely high prices for petroleum products in American Samoa.

62(a) Between 1956 and 1970, SoCal supplied petroleum products in

Samoa at domestic prices instead of providing petroleum products at cheaper world market prices. [TR 1288–1290].

62(b) Because of high Samoan diesel fuel prices and because about 65% of the cost to GAS of producing electricity is accounted for by the cost of diesel fuel, Samoan electric costs have been high. [TR 99, TR 215, GX 149, GX 150].

62(c) The cost of diesel fuel to the foreign fishing fleets serving the Samoan canners has been maintained at prices which were among the highest in the world. [GX 133, GX 117, GX 123].

62(d) The prices of aviation fuel to the commercial airlines serving American Samoa have been among the highest in the world. [TR 2421–2423].

62(e) Since 1956, the Department of Defense ("DOD") has paid higher prices for aviation gasoline and jet fuel procured at Samoa than at Fiji where there is competition on the part of four suppliers of petroleum products. [TR 3072–3073; TR 3060–3061; TR 1411].

63. Despite repeated efforts by several administrations, GAS has been unable to attract a source of supply to compete with SoCal. [TR 191, TR 219, TR 493, GX 154, GX 155, GX 157, GX 158, GX 236, GX 249 C, GX 250–252].

64. Since 1956, even though the Department of Defense ("DOD") has repeatedly solicited proposals for jet fuel and/or aviation gasoline from all major suppliers servicing the Pacific, only SoCal, because of its monopoly position in Samoa, could respond, and it has retained the DOD business during the entire period. [D 2 B; GX 161, TR 1232–1233; TR 3058–3060].

65. Commercial airlines have minimized their purchases of aviation fuel at American Samoa because of SoCal's high prices there compared with the competitive markets of Tahiti and Fiji.

65(a) SoCal's aviation fuel prices have been maintained at higher levels at American Samoa than at Tahiti which is served by the same tanker and is further from Hawaii than American Samoa, but where SoCal encounters "competition for avfuels" from three suppliers. [GX 14, TR 1060, Amended GX 130, pp. 8–9; GX 127–128].

65(b) SoCal's aviation fuel prices have been maintained at substantially higher levels at American Samoa than are charged at Fiji, where SoCal encounters competition. [Amended GX 130, pp. 6–9; GX 165 A].

65(c) Because Samoan aviation fuel prices are higher than those at Tahiti and Fiji, the amount of stored fuel a Pan Am pilot having any choice would be expected to take on at Tafuna Airport is minimized. [GX 162, GX 163; TR 2414–2417, TR 1082–1083].

65(d) Because Samoan aviation fuel prices are higher than Fiji's, Air New Zealand no longer takes on any aviation fuel at American Samoa. [GX 12].

66. American Samoa has suffered a loss of business, revenues, taxes and duties, due to SoCal's pricing policies, and the Samoan economy has suffered as a result. [TR 496, TR 519–520].

66(a) As a result of SoCal's price increase of 1.3¢ per gallon for SDFS in June, 1972, the GAS cost of doing business has been increased. [TR 506–507; TR 522].

66(b) Increased fuel prices result in loss of matching funds that are used by GAS to obtain federal programs for Samoa. [TR 519–520].

66(c) One reason why Pan Am resisted increasing flights through Samoa was the high cost of Samoan aviation fuel, and fuel and oil accounts for more than half of the total flying costs of Pan Am planes in the Pacific and approximately one-third of total aircraft operating expenses in that area. [TR 201–203, TR 453–454; GX 258–264].

67. Because of SoCal's dominant position in American Samoa, its illegal combination and conspiracy with the canners and the illegal requirements contracts, many potential competitive petroleum suppliers have been foreclosed from the market, including the following:

| | |
|---|---|
| *Stanvac*: | [GX 254] |
| *Mobil*: | [GX 153, GX 174–182, GX 185, GX 192–194, GX 143B; TR 1279–1281] |
| *UNOCO*: | [GX 195–199, GX 58–61, GX 154–155, GX 200, GX 202, GX 206; TR 2633–2634] |
| *Shell*: | [GX 253AA, GX 253, GX 253A–D, GX 139, GX 207, GX 72, GX 156–158, GX 208–213; TR 489, TR 506–507] |
| *Proposed Joint Fuel Storage Facility*: | [GX 66–68, GX 74, GX 79A; TR 445–446, TR 1295–1296] |
| *William R. McCook*: | [TR 2064–2065, TR 2071, TR 2074; GX 228] |
| *Time Oil*: | [TR 2594, TR 2606, TR 2603–2604; GX 147, GX 172, GX 214–215] |
| *British Petroleum*: | [GX 229–234] |

## D. GENERAL FINDINGS

68. Neither the Permit and Agreement of 1956 [GX 9], nor SoCal's unilateral letter undertaking to base its Samoan prices on posted domestic prices at Richmond, California [D–3–O], nor the pertinent section of the Buy American Act [41 U.S.C. Sec. 10b(a)], required SoCal to provide only domestic fuel in Samoa.

68(a) Interior experts told SoCal in November 1964 that "The Buy American Act permitted purchase of foreign products by the Government of Samoa if there was more than a 6% price differential." [D–14 U].

68(b) SoCal never offered a price on foreign fuel to GAS during Governor Lee's tenure, although its use would have resulted in a considerable saving to Samoa. It was not until Governor Haydon had put out requests for proposals to other oil companies in early 1970, that SoCal sought authority to use foreign fuel. [TR 1278–1281, TR 1284, TR 1143, GX 250–252].

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter of the complaint herein and the parties hereto.

■ 2. SoCal has, since at least 1956, violated Section 3 of the Sherman Act by engaging in a continuing combination and conspiracy with various persons, including certain GAS officials and Van Camp and Star-Kist, to unreasonably restrain and monopolize the distribution and sale of petroleum products in American Samoa. United States v. Maryland and Virginia Milk Producers Ass'n., 168 F.Supp. 880, 881, 882 (D.C. D.C.1959), aff'd 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960); United States v. Patten, 226 U.S. 525, 544, 33 S.Ct. 141, 57 L.Ed. 333 (1913); American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. United States Gypsum Co., 333 U.S. 364, 395–396, 68 S.Ct. 525, 92 L.Ed. 746 (1948); United States v. National City Lines, 186 F.2d 562, 572 (7th Cir. 1951), cert. denied, 341 U.S. 916, 71 S.Ct. 735, 95 L. Ed. 1351 (1951); Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 453, 60 S.Ct. 618, 84 L.Ed. 852 (1940); United States v. Giuliano, 263 F.2d 582, 584 (3rd Cir. 1959); Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L. Ed. 150 (1954); United States v. Nelson, 419 F.2d 1237, 1243–1245 (9th Cir. 1969).

3. Pursuant to said combination and conspiracy, SoCal acted in concert with the GAS officials involved to preclude other oil companies from competing with SoCal for the occupancy, use and control of the GAS bulk petroleum storage facilities.

4. Pursuant to said combination and conspiracy, SoCal entered into long-term requirements contracts with Van Camp (in 1956 and 1965) and with Star-Kist (in 1963).

5. Van Camp and Star-Kist have participated in the unlawful combination and conspiracy by informing SoCal in detail of competitive activity in Samoa, by tying their own requirements and those of their foreign fishing fleets to SoCal, and generally by protecting SoCal's monopoly position in Samoa.

6. The effect of the aforesaid combination and conspiracy has been unreasonably to restrain and monopolize the distribution and sale of petroleum products in American Samoa.

7. The long term requirements contracts which SoCal entered into with Van Camp, Star-Kist and Pan Am, are in and of themselves and apart from said combination and conspiracy, in unreasonable restraint of trade in petroleum products in American Samoa in violation of Section 3 of the Sherman Act, because they have foreclosed competition in a substantial share of that market. Standard Oil Company of California v. United States, 78 F.Supp. 850 (S.D.Cal. 1948) aff'd 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); United States v. American Can, 87 F.Supp. 18 (N.D.Cal. 1949); Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); Twin City Sportservice v. Finley, 365 F.Supp. 235 (N.D. Cal.1972).

8. The relief necessary to open the Samoan market to competition and dispel the unlawful effects of the violations found herein is the following:

(a) that defendant is enjoined and restrained from continuing, reviving or renewing the aforesaid combination and conspiracy;

(b) that defendant is ordered to refrain from enforcing, continuing, reviving or renewing the aforesaid requirements contracts, or from entering into any other contracts having the same purpose or effect; and

(c) that defendant is ordered to take all necessary steps so as to enable other suppliers or distributors of petroleum products to use an adequate portion of the GAS storage facilities on a shared cost basis to enable said suppliers or distributors to compete in the Samoan market, in particular to afford GAS the opportunity to obtain competitive bids every three years commencing forthwith for its requirements of petroleum products. United States v. E. I. duPont deNemours & Co., 366 U.S. 316, 322, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961); Ford Motor Co. v. United States, 405 U.S. 562, 573–578, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972); International Salt Co. v. United States, 332 U.S. 392, 401, 68 S. Ct. 12, 92 L.Ed. 20 (1947); United States v. E. I. duPont & Co., 353 U.S. 586, 607–608, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); United States v. Crescent Amusement Co., 323 U.S. 173, 185, 65 S.Ct. 254, 89 L.Ed. 160 (1944); Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 461, 60 S.Ct. 618, 84 L.Ed. 852 (1940); United States v. United States Gypsum Co., 340 U.S. 76, 88–89, 71 S.Ct. 160, 95 L.Ed. 89 (1950); United States v. Loew's Inc., 371 U.S. 38, 53, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962).

9. The parties are requested to file suggested changes, corrections, etc., in these findings and conclusions within thirty days of this date, along with a suggested form of final judgment.

## FINAL JUDGMENT

Plaintiff, United States of America, filed its complaint on September 30, 1969, and the defendant, Standard Oil of California ("SoCal") appeared and filed its answer. Trial having been completed and the court having considered

the pleadings, evidence, briefs and arguments, and being fully informed, entered findings of fact and conclusions of law on October 26, 1972.

Now, therefore, it is hereby ordered, adjudged and decreed as follows:

## I

This court has jurisdiction over the subject matter of the complaint herein and the parties hereto.

## II

Based upon the court's findings of fact and its conclusions of law, the defendant has (1) engaged in a combination and conspiracy to unreasonably restrain and monopolize trade and commerce in the distribution and sale of petroleum products in the United States Territory of American Samoa and between that Territory and States of the United States in violation of Section 3 of the Sherman Act; and (2) entered into contracts with Van Camp Sea Food Company ("Van Camp"), Star-Kist Foods, Inc. ("Star-Kist"), and Pan American World Airways ("Pan-Am") in unreasonable restraint of said trade and commerce in petroleum products in violation of Section 3 of the Sherman Act.

## III

The provisions of this Final Judgment shall apply to the defendant, its successors, subsidiaries, assigns, officers, directors, agents and its employees, and to all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

## IV

(a) The defendant is enjoined and restrained from continuing, reviving, or renewing the aforesaid combination and conspiracy.

(b) The defendant is ordered to refrain from enforcing, continuing, reviving, or renewing any requirements contracts with customers in Samoa.

(c) The defendant is ordered to permit other suppliers or distributors of petroleum products to use an adequate portion of the Government of American Samoa ("GAS") petroleum storage facilities on a shared-cost basis to enable said suppliers or distributors to compete in the American Samoan market. Within sixty (60) days of the effective date hereof, defendant shall serve upon plaintiff a plan pursuant to which such suppliers or distributors will be permitted so to use the facilities. Thereafter the parties shall attempt to reach agreement on a plan to be filed with and approved by the Court. If agreement cannot be reached within one hundred twenty (120) days of the effective date hereof, resort shall be had to the Court for hearing and determination.

## V

(a) For the purpose of determining or securing compliance with this Final Judgment, any duly authorized representative of the Department of Justice shall, upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to the defendant, made to its principal office, be permitted:

(1) Access during the office hours of said defendant to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of said defendant relating to any matters contained in this Final Judgment; and

(2) Subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview officers or employees of said defendant, who may have counsel present, regarding any such matters.

(b) Upon written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, the defendant shall submit such reports in writing to the plaintiff with respect to matters contained in this Final Judgment as may from time to time be requested.

(c) No information obtained by the means provided in this Section V shall be

divulged by any representative of the Executive Branch to any person other than a duly authorized representative of such Branch, except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

## VI

Jurisdiction is retained for the purpose of enabling either of the parties to this Final Judgment to apply to this court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of the provisions hereof, for the enforcement of compliance therewith, and for the punishment of the violation of any of the provisions contained therein.

## VII

Plaintiff shall recover the costs of this action from defendant.